Juan Celso González Vélez, Petitioner, *v.* Superior Court of Puerto Rico, Ponce Part, J. M. Almodóvar Acevedo, Judge, Respondent. The People of Puerto Rico, Intervener.

No. 1998.  Argued May 4, 1953.—Decided December 30, 1953.

552

*Aníbal Padilla* for petitioner.  *José Trías Monge, Attorney General,* (*Juan B. Fernández Badillo, Acting Attorney General,* in the brief) and *Rafael L. Ydrach Yordán, Assistant Fiscal,* and *Jaime García Blanco, Special Fiscal of the Supreme Court,* for intervener.  *J. J. Saúl Dalmau* for *amicus curiae.*

MR. CHIEF JUSTICE SNYDER delivered the opinion of the Court.

On a date subsequent to October 15, 1952, Juan Celso González was convicted of aggravated assault and battery in the District Court.  Thereafter he appealed to the Supe-

rior Court, where the record was duly filed. On December 17, 1952, the defendant filed a motion praying for a trial *de novo* in the Superior Court.

Section 19 of Act No. 11, Laws of Puerto Rico, 1952, Special Session, known as the Judiciary Act of the Commonwealth of Puerto Rico, abolished the right of a trial *de novo* on appeal from the District Court to the Superior Court which formerly existed under the Act of March 11, 1908, Laws of Puerto Rico, 1908, p. 168.[1] In its place, § 19 provided for appellate review by the Superior Court of judgments of the District Court based on the record made in the latter court. And § 37 of Act No. 11 provided that § 19, creating this new type of review, shall take effect on October 15, 1952. Despite the terms of § § 19 and 37, the defendant contended in his motion that he was entitled to a trial *de novo*. He pointed to the provision in § 19 that the procedure on appeal in such cases shall be in accordance with the rules established by the Supreme Court, and he argued that the new type of review cannot go into effect until we promulgate such rules.

The defendant recognized that on October 7, 1952 this Court issued the Rules for Appeals from the District Court to the Superior Court, effective October 15, 1952. However, the defendant contended that these Rules have not yet taken effect because they have not been submitted to the Legislative Assembly pursuant to § 6 of Article V of the Constitution of the Commonwealth of Puerto Rico.[2] He therefore

---

[1] The Act of 1908 has been amended by Act No. 13, Laws of Puerto Rico, 1917, Vol. II; Act No. 2, Laws of Puerto Rico, 1929; and Act No. 31, Laws of Puerto Rico, 1934.

[2] Section 6 of Article V reads as follows: "The Supreme Court shall adopt for the courts rules of evidence and of civil and criminal procedure which shall not abridge, enlarge or modify the substantive rights of the parties. The rules thus adopted shall be submitted to the Legislative Assembly at the beginning of its next regular session and shall not go into effect until sixty days after the close of said session, unless disapproved by the Legislative Assembly, which shall have the power both at said session and subsequently to amend, repeal or supplement any of said rules by a specific law to that effect."

argued that the former provisions of the Act of 1908 as amended for a trial *de novo* are still controlling. For the same reasons, the defendant also took the position that he was not required to file in the Superior Court a brief containing an assignment of errors, as provided in Rule 7 of the Rules for Appeals from the District Court to the Superior Court.[3]

The Superior Court denied the motion of the defendant for a trial *de novo* in the Superior Court. It held that the Rules for Appeals from the District Court to the Superior Court had gone into effect on October 15, 1952, despite the fact that they had not been previously submitted to the Legislative Assembly. Because the question of his right to a trial *de novo* was a new one, the Superior Court gave the defendant ten additional days to file his brief under Rule 7. Instead of filing his brief, the defendant filed a petition for certiorari in this Court to review the order of the Superior Court denying his motion for a trial *de novo*. In view of the importance of the matter, we heard the parties, both orally and by brief, before undertaking to pass on the petition for certiorari.

I

*Rule-Making Power of the Courts in General*

██ The power of the courts to regulate their own procedure has had a somewhat checkered career. Roscoe Pound has shown that in England regulation of procedure has gone

---

[3] Rule 7 reads in part as follows: "Within fifteen (15) days after the parties are notified of the filing of the record on appeal, or within whatever extension of time is granted, the attorney for the appellant shall file in the Superior Court his brief which shall contain a concise statement of the facts of the case, as well as an assignment of errors alleged to have been committed by the District Court. Each error shall be assigned and discussed separately in the brief. If appellant fails to file his brief within the term provided herein or within the extension granted him, the court *motu proprio* or on motion of appellee shall dismiss the appeal."

through four stages. First, procedure was governed by custom. Second, changes were made by rules of court. Third, Parliament entered the picture and made sweeping changes. Fourth, since 1873 the English have returned to regulation of procedure by rules of court. Pound, *The Rule-Making Power of the Courts*, 12 A.B.A. J. 599; *Winberry v. Salisbury*, 74 A.2d 406, 412 (N.J., 1950).

Accordingly, Pound, *supra*, concluded that (p. 601) " . . . if anything was received from England, as a part of our institutions, it was that the making of these general rules of practice was a judicial function. Indeed, this was well understood in the beginning of American law. At the very outset, the Supreme Court of the United States, in answer to an inquiry by the Attorney General, said that the practice of the court of King's Bench would obtain for the time being, but that presently the court would promulgate some rules of practice." [4]

However, it cannot be gainsaid that, as in England, about the middle of the nineteenth century the state legislatures in the United States encroached upon the field of procedure which had previously been the province of the judiciary. Pound, *supra*, attributes this temporary result to four factors: (1) the legislative hegemony, based on the attitude of legislative omnicompetence, which existed in that era; (2) the over-conservatism of the legal profession at that time; (3) the unavailability of models, such as existed in the field of substantive law in England and continental Europe, for the development of adequate procedure by the courts; (4) the apprentice training of the lawyers of that day inevitably tended to emphasize training in details of procedure; this in turn led the lawyers to regard procedure

---

[4] This statement of the Supreme Court of the United States is found in 2 Dall. 411, 413–14 (1792), 1 L.ed. 437. To the same effect, Pound, *Rules of Court in New Jersey*, 66 Harv.L.Rev. 28, 35–36, footnote 18; *Winberry* v. *Salisbury*, *supra*, p. 413.

as akin to substantive law; and the latter field must of course be left to the legislature under separation of powers.

Fortunately, there has been a revival of the concept of procedural rule-making by the judicial branch. The courts, the legislatures and constitutional conventions gradually came to realize that the power to make their own procedure must rest in the courts if they are to administer justice effectively.[5] As a result, we have witnessed in the twen-

---

[5] Pound, *supra*, pp. 601–2, stated the case in favor of the rule-making power by the courts as follows:

"In truth procedure of courts is something that belongs to the courts rather than to the legislature, whether we look at the subject analytically or historically. It is a misfortune that the courts ever gave it up. Analytically there is no more warrant for the legislature's imposing a strait-jacket of statutory procedure upon the courts than for its doing the like with the executive. No one supposes that the courts can impose their general ideas of executive procedure. Nor would the idea that the minutiae of judicial procedure can be laid down by legislators have taken root had it not been for the rule-of-thumb apprentice training of the bulk of the profession, which led them to feel that the whole of the law was bound up in procedure and hence that the legislature must prescribe judicial procedure or abdicate control over the law. . . .

"It is a misfortune that American courts ever gave up their control of procedure. It may be that today, after seventy-five years of codes and practice acts and prolific procedural legislation, we can't go so far as to pronounce such legislative interference with the operations of a co-ordinate department to be unconstitutional. Perhaps the ground is so far debatable that the courts could not have resisted legislative annexation of that domain. Today, possibly, we must concede that the legislature may enact codes of procedure and detailed practice acts. Equally, however, we should insist that the legislature ought not to do such things, not merely on grounds of expediency and for the sake of a better and more effective administration of justice, but as a matter of due regard for the constitutional system of separation of powers. None of the co-ordinate and coequal departments of our polity can do its work effectively if the minute details of its procedural operations, as distinct from the substantive law it applies or administers, are dictated by some other department. That the legislature should claim such a power is something that comes down to us from the extravagant claims of the legislatures in the period of legislative hegemony. The legislature ought to leave judicial procedure to the judiciary as the judiciary must leave legislative procedure (except as prescribed sometimes by state constitutional provisions) to the legislature. Certainly, if legislatures choose to abdicate

tieth century a tremendous resurgence of the power of the courts to regulate their own procedure.[6]

■ While the return to the fundamental principle of procedural rule-making by the courts was occurring, some scholars and a number of courts were asserting that the courts have the *absolute* power to regulate their own procedure. By "absolute power" these authorities mean that the legislature may never enact a statute in this field. Their thesis is that the absolute rule-making power is inherent in the courts and interference therewith by the legislature

their acquired power and to leave judicial procedure to the courts where it belongs, there can be no constitutional objection."

These views were reiterated recently in Pound, *supra*, 66 Harv.L.Rev. 28, 32, 40, where he pointed out that "Today a legislature must deal in a limited time with a large volume of proposals for legislation. Also popularly elected lawmakers . . . have more interest in measures attracting public notice than in dry minutiae of legal procedure. Political questions, appropriations, economic questions, the machinery of government, provision for administration and police, social security and welfare, and humanitarian projects must have the right of way." Pound then goes on to quote from Cardozo, *A Ministry of Justice*, 35 Harv.L.Rev. 113, 113–14, that "The legislature, informed only casually and intermittently of the needs and problems of the courts, without expert or responsible or disinterested or systematic advice as to the workings of one rule or another, patches the fabric here and there, and mars often when it would mend."

Pound is not alone in those views. Practically all the scholars and courts who have written in this field share them. Clark and Rogers, *The New Judiciary Act of Puerto Rico: A Definite Court Reorganization*, 61 Yale L.J. 1147, 1149, footnote 9, and authorities cited therein; Clark and Wright, *The Judicial Council and the Rule-Making Power: A Dissent and a Protest*, 1 Syracuse L.Rev. 346, 363; Gertner, *The Inherent Power of Courts to Make Rules*, 106 U. Cinc.L.Rev. 32; *The Improvement of the Administration of Justice*, A Handbook Prepared by the Section of Judicial Administration, A.B.A., pp. 11–12 (3d ed. 1952); *Winberry* v. *Salisbury, supra*, pp. 413–4; Annotations, 110 A.L.R. 22; 158 A.L.R. 705.

[6] *The Improvement of the Administration of Justice, supra*, states at p. 11: "The movement for return of rule-making authority to the courts began many years ago, with the enactment of the English Supreme Court of Judicature Act of 1873. Few states joined the trend before 1930, but since then a growing number of jurisdictions have enacted statutes or constitutional provisions empowering the highest court of the state to regulate practice and procedure in all, or practically all, of the courts of the state, until now the 48 states are equally divided between those in which the court has such power and those in which it does not. In

violates the doctrine of separation of powers.[7]    But the cases
are divided on the subject.    Annotations, 110 A.L.R. 22; 158
A.L.R. 705.    And however sound this view may be ana-
lytically, it is difficult in view of nineteenth-century history
to assert that, solely on the basis of the general doctrine of
separation of powers, the courts today have an *inherent* rule-
making power which is so sweeping that the legislature is

a number of the latter states active efforts are being made to obtain
passage of a rule-making act."

See Vanderbilt, *Minimum Standards of Judicial Administration*, p. 97
*et seq.;* Pound, *Appellate Procedure in Civil Cases*, p. 323; Clark and
Wright, *supra*, p. 351; Clark, *The Federal Rules in State Practice*, 23
Rocky Mountain L. Rev. 520; Clark, *The Influence of Federal Procedural
Reform*, 13 Law and Contemporary Problems, 144, 160 *et seq;* Clark on
*Code Pleading,* 2d ed., p. 50 *et seq.; 1942 Annual Survey of American
Law*, pp. 791–3; 1948, *id.*, pp. 945–6; 1951, *id.*, pp. 799–800; Peterfreund,
*The Essentials of Modern Reform in the Litigative Process*, 287 The
Annals, American Academy of Political Science 154, 161.

As Chief Justice Vanderbilt has put it in *Winberry* v. *Salisbury*,
*supra*, p. 413: "The trend throughout the country has been to give the
courts the power to regulate their own procedure and administration and
then to hold them responsible for results."

[7] Pound, *supra*, 66 Harv.L.Rev. 28, 37, states that "It must be remem-
bered that without the constitutional provision the courts had an inherent
power of making rules of procedure." Wigmore, *All Legislative Rules
for Judiciary Procedure Are Void Constitutionally*, 23 Ill.L.Rev. 276, agrees
with this thesis. See also, Clark on *Code Pleading*, 2d ed., pp. 61–2,
footnote 166; Gertner, *supra*, pp. 44–45; Keeffe, Brooks and Greer, *86
or 1100*, 32 Cornell L.Q. 253, 263; Trumbull, *Judicial Responsibility for
Regulating Practice and Procedure in Illinois*, 47 N.W. U.L.Rev. 443,
444–49; Notes, 29 Ill.L.Rev. 911; Annotations, 110 A.L.R. 22, 23, 158
A.L.R. 705, 706.

The Executive Committee of The National Conference of Commis-
sioners on Uniform State Laws stated, with regard to a proposal that
the Conference draft a Uniform Act Establishing Rule-Making Power in
The Courts, the following: "The Committee feels that there is no necessity
for such an act, as the inherent power of the courts to adopt rules has
been questioned in only a few states, and such legislation would be neces-
sary only in those states where that inherent power has been questioned."
Handbook of the National Conference of Commissioners on Uniform State
Laws, 1952, p. 93.

In some states, where enabling statutes conferring the rule-making
power on the courts have been enacted, the courts have taken the position
that such statutes add nothing to the inherent power already possessed
by the courts. Even where such a statutory basis exists, these courts
have sustained the validity of rules on the basis of their inherent power

powerless to enact statutes regulating the procedure of the courts. In this connection, it is worthy of note that the absolute rule-making power which now exists in New Jersey is not based on inherent power and the separation of powers. Rather the recent New Jersey constitution contains a clause

---

without relying on the legislative authority. *Epstein* v. *State*, 128 N.E. 353 (Ind., 1920) is such a case. And see Gortner, *supra*, p. 46.

A leading case dealing with this subject is *Hanna* v. *Mitchell*, 196 N.Y.S. 43 (App. Div., First Dept., 1922). In that case the court upheld a rule permitting summary judgments and held that a statute delegating to a convention of justices of the supreme court the power to make rules of procedure was not invalid as a delegation of legislative power because the power to adopt rules of procedure is a judicial power inherent in the courts. The court said at pp. 51–52:

> "The power to make rules was inherent in the Courts of King's Bench, Common Pleas and Exchequer of England, and would have been conferred on the Supreme Court without the express grant of such power contained in the act. As we have shown, the common law of England and the acts of the Colonial Legislature became the law of this state by virtue of the provisions of the Constitution above quoted. This power was exercised by the Supreme Court for 86 years before there was a legislature in the state of New York, and for 137 years prior to the adoption of title 3 of chapter 1 of part 3 of the Revised Statutes, which contains the section referred to as the source of the power. That section was but a legislative recognition of a power that had long existed, which was embodied with other pre-existing laws in the Revised Statutes. . . . The power to make rules governing the practice and procedure in the courts is a judicial and not a legislative power. . . .

> "We conclude that the power to make rules of practice is a judicial power inherent in, and expressly conferred upon, the Supreme Court, and that the act creating the convention to adopt rules of civil practice merely provided a method and means whereby the court could conveniently and expeditiously exercise its judicial duty, and it was in no sense a delegation of legislative power by the Legislature."

To the same effect, *General Inv. Co.* v. *Interborough Rapid Transit Co.*, 139 N.E. 216, 220 (N.Y., 1923).

Another leading case espousing the view that the power to adopt rules of procedure is inherent in the judicial department is *Kolkman* v. *People*, 300 Pac. 575, 584 (Colo., 1931). See also *State* v. *Roy*, 60 F.2d 646 (N.M., 1936); *De Camp* v. *Central Arizona Light & Power Co.*, 57 P.2d 311 (Ariz., 1936). *Cf.* Rottschaefer on *Constitutional Law*, pp. 52–3; Clark and Wright, *supra*, p. 366, footnote 96.

Some cases have held procedural statutes unconstitutional as infringements upon the inherent rule-making power of the judiciary. *Agran* v. *Checker Taxi Co.*, 105 N.E.2d 713 (Ill., 1952); *Atchison, T. & S. F. Ry. Co.* v. *Long*, 251 Pac. 486 (Okla., 1926); *Schario* v. *State*, 138 N.E. 63

specifically conferring this unfettered power on the Supreme Court.[8]

On the other hand, to say that the courts do not have inherent *absolute* rule-making power does not mean that the courts have no inherent power at all in this field.[9] On the contrary, it is well-established that if no procedure, or an inadequate procedure, is provided by the legislature in a

(Ohio, 1922); *Solimito* v. *State*, 122 N.E. 578 (Ind., 1919); *Trumbull*, *supra*, p. 448, footnote 42. In similar situations in this jurisdiction we have avoided declaring statutes which require the courts to decide cases within a specific period null by interpreting them as merely directory and not mandatory. *Bages & Co., Inc.* v. *District Court*, 65 P.R.R. 204, and cases cited.

[8] In New Jersey the Constitution provides that "The Supreme Court shall make rules governing the administration of all courts in the State and, subject to law, the practice and procedure in all such courts." In *Winberry* v. *Salisbury, supra*, the Supreme Court of New Jersey held that "subject to law" did not mean subject to legislation in the field of procedure. Rather it meant that the rules of procedure were subject to —could not encroach on—substantive law as distinguished from procedure. The court therefore concluded that its rule-making power was not subject to overriding legislation on procedure; its only limitation is that it is confined to procedure and administration. There is a brief reference at p. 412 to the "inherent" power of courts in rule-making as an exception to "an oversimplified statement of the doctrine of separation of powers . . . " (This contrasts with the theory of those who predicate the inherent rule-making power precisely on the separation of powers, see footnote 7.) But Chief Justice Vanderbilt in his opinion relies almost exclusively on the history and specific language of the quoted provision of the New Jersey constitution. For opposing views of the *Winberry* case, compare Kaplan and Greene, *The Legislature's Relation to Judicial Rule-Making: An Appraisal of Winberry* v. *Salisbury*, 65 Harv.L.Rev. 234 with Pound, *supra,* 66 Harv.L.Rev. 28.

[9] We are aware of the dangers involved in attributing "inherent" power to a branch of government. "The accumulated weight of repetition behind such a phrase as 'inherent powers' of the lower Federal courts is a constant invitation to think words instead of things." Frankfurter and Landis, *Power of Congress Over Procedure in Criminal Contempts In "Inferior" Federal Courts—A Study in Separation of Powers*, 37 Harv.L.Rev. 1010, 1022–23. However, this does not mean that we can discard altogether the concept of "inherent" power. The courts have inherent power by way of civil contempt to enforce their judgments under certain circumstances through the coercive means of indefinite incarceration. *Espinosa* v. *Ramírez, Warden*, 72 P.R.R. 842, and cases cited; *Espinosa* v. *Ramírez*, 71 P.R.R. 10; *Dubón* v. *Casanova*, 65 P.R.R. 786; *United States* v. *Mine Workers*, 330 U.S. 258. We also have inherent power to admit and to discipline members of the bar; legislation thereon is only

particular situation, the courts have the inherent power—and duty—to establish or supplement it by rules, provided the latter are not inconsistent with the statute. *Glenn* v. *McCarty*, 110 S.W. 2d 1148, 1150 (Tex., 1937); *Byers* v. *Smith*, 47 P.2d 705 (Calif., 1935); *People* v. *Jordan*, 65 Calif. 644 (1884); *State* v. *Roy, supra;* Annotations, 110 A.L.R. 22, 27–8, 158 A.L.R. 705, 706; 3 Cal. Jur. 2d pp. 384–5.[10] This Court has held that an analogous power exists to fill in procedural gaps by judicial decisions under §§ 7 of the Civil Code and 36 of the Code of Civil Procedure. See text of opinion preceding footnote 14, *infra.*

---

advisory, not binding on us. *In re Abella,* 67 P.R.R. 211, 219; *Ex parte Jiménez,* 55 P.R.R. 51. The then Chief Justice Todd, testifying before the Judiciary Committee of the Constitutional Convention in the name of this Court, recommended that nothing be inserted in the Judiciary Article of the Constitution with reference to civil contempt and disbarment as these were inherent powers of the judiciary. Transcript of Public Hearings before the Judiciary Committee of the Constitutional Convention, p. 165. The Convention accepted this recommendation.

In discussing this question, Rottschaefer on *Constitutional Law* states at p. 52, footnote 31, that "The term 'inherently' should mean only that the power in question was impliedly included in the grant made by the constitution in distributing governmental powers, although it is sometimes used to indicate that the power in question necessarily belongs to a department without reference to the constitutional grant."

[10] In *Glenn* v. *McCarthy, supra,* the court said at p. 1150: "It is settled that, where a statute prescribes a rule of procedure, such rule so prescribed in the statute will control. . . . This court has repeatedly recognized that the Legislature has the power, under the Constitution, to enact rules relating to the right of appeal, and modify them at will. But if the Legislature has provided no mode of procedure for appealing cases, the Supreme Court has authority to adopt such rules for that purpose."

Pound, *supra,* 66 Harv.L.Rev. 28, 31, points out that in New Jersey "Under the pre-existing system the court had an inherent power to make rules of practice and procedure subject to legislative action on details." And Peterfreund, *supra,* p. 155, states that "The power of courts to make and alter rules of procedure has actually existed for centuries, but, until our century, has seldom been exercised in the United States, *except as supplementary to a set of statutory rules.*" (Italics ours.) To the same effect, Vanderbilt points out in *Minimum Standards of Judicial Administration* at pp. 98–9, that "Under any phase of development the courts always retained a measure of authority to prescribe necessary supplementary rules of procedure . . . " See also Pound, *Appellate Procedure in Civil Cases,* p. 374.

■ It remains only to note that in many instances the power to adopt rules of procedure for all the courts of a state has been conferred on the court of last resort by statutory rather than by constitutional provisions. Such statutes have been attacked as improper delegations of legislative power. In the field of substantive law, the courts have sustained statutes authorizing executive and administrative agencies to adopt regulations having the force of law, *provided the statutes laid down a standard or policy, for which the regulations filled in the details.* *Hilton Hotels International Inc.* v. *Minimum Wage Board,* 74 P.R.R. 628, 649, and cases cited; *Godreau & Co.* v. *Public Service Comm'n,* 71 P.R.R. 608, 611; *People* v. *Rivera,* 67 P.R.R. 175, 177; *Luce & Co.* v. *Minimum Wage Board,* 62 P.R.R. 431; *Irizarry* v. *District Court,* 64 P.R.R. 90; *Secretary of Agriculture* v. *Central Roig Co.,* 338 U.S. 604; Schwartz, *A Decade of Administrative Law: 1942–1951,* 51 Mich.L.Rev. 775, 776–84. But in the field of procedure, the statutes vesting the courts with procedural rule-making power have been upheld by the overwhelming weight of authority despite the fact that they lay down no such standards and give the courts broad and unfettered power to adopt rules. The reasoning most frequently used for not requiring statutes conferring rule-making power on the courts to establish standards therefor may be summarized as follows: The power to provide procedure for the courts is neither exclusively legislative nor exclusively judicial, but may be exercised by either department. Consequently, withdrawal of the legislative from the field of procedure does not require it to lay down standards for the courts to exercise a power which the latter already possess concurrently with the legislature. Stated somewhat differently, such a statute is not an invalid delegation of legislative power because it is not a grant of power as such. *Kolkman* v. *People, supra; In re Constitutionality of Section 251.18, Wis. Statutes,* 236 N.W. 717 (Wis., 1951); *State* v. *Roy, supra; Petition of Florida State Bar Ass'n, Etc.,* 21

So.2d 605 (Fla., 1945); *State v. Superior Court*, 267 P. 770 (Wash., 1928); *Burney v. Lee*, 129 P.2d 308 (Ariz., 1942); *Wayman v. Southard*, 10 Wheat. 1, 6 L.ed. 253; Pound, *supra*, 66 Harv.L.Rev. 28, 33–4; Pound, *Regulation of Judicial Procedure by Rules of Court*, 10 Ill.L.Rev. 163, 170 *et seq.;* Rottschaefer on *Constitutional Law* 52; Morgan, *Judicial Regulation of Court Procedure*, 2 Minn.L.Rev. 81, 91–6; Annotations, 110 A.L.R. 22, 38; 158 A.L.R. 705, 710.[11] As we shall see, the theory on which these cases were decided plays a role in the present case.[12]

## II
### *Rule-Making Power of Supreme Court of Puerto Rico*

From 1900 to 1952, the power to regulate the procedure of our courts was specifically vested in the Legisla-

---

[11] In *Burney v. Lee, supra,* involving a statute conferring the rule-making power on the Supreme Court, the court said at p. 311 that it "was not unconstitutional as an unauthorized delegation of legislative power, but was merely a withdrawal by the legislature from the field in which it had at most merely concurrent power with the courts."

In *State v. Roy, supra,* the court said at p. 660 that "When the legislature enacted chapter 84 [granting the Supreme Court the power to adopt rules of procedure for the courts] it merely withdrew from a field wherein it had theretofore functioned as a co-ordinate branch of our government with the court in the promulgation of rules of pleading, practice, and procedure. Whether the legislative branch of the government was ever rightfully in the rule-making field, or was a mere trespasser or usurper, need not now be determined. Chapter 84 is not a delegation of power. It is a mere abdication or withdrawal from the rule-making field. It is in effect a relinquishment of the rule-making field to the court." [Matter in brackets ours.]

[12] In upholding legislation of both types—statutes authorizing regulations by the executive in substantive law and statutes granting the courts procedural rule-making power—the courts have almost universally rejected doctrinaire absolutism in applying the theory of separation of powers to the trichotomy of legislature, executive and judiciary. They have recognized that the powers of the three branches of government sometimes overlap and that separation of powers is not a formula which can be applied with "mathematical precision" to "divide the branches into watertight compartments" (Holmes, J., dissenting, in *Springer v. Philippine Islands*, 277 U.S. 189, 209, 211). On the contrary, "The exigencies of government have made it necessary to relax a merely doctrinaire adherence to a principle so flexible and practical, so largely a matter of sensible approximation, as that of the separation of powers." (Judge Cardozo

ture as a matter of constitutional law. Both § 33 of the Foraker Act and § 40 of the Jones Act provided that "the form of procedure" in the courts shall continue as then provided "until otherwise provided by law . . . " 31 Stat. 77, 84; 39 Stat. 951, 965. Nevertheless, the Legislature from the beginning relaxed to a slight extent this complete control over procedure vested in it by the Organic Act. It provided that this Court could adopt rules not inconsistent with statutes "for its own government . . . " And it empowered the then district courts to make rules of procedure for themselves provided they were approved by the Attorney General. Section 8, Code of Civil Procedure, 1933 ed.; see also § 4 of Act No. 105, Laws of Puerto Rico,

---

in *In re Richardson,* 160 N.E. 655, 657 (N.Y., 1928).) As we have pointed out, "it cannot be stated too emphatically that the departments of government are as much interconnected in their operations as they are independent. In Madison's phrase, the powers of government have been blended rather than separated." *Banco Popular de Puerto Rico* v. *District Court,* 63 P.R.R. 63, 69. In short, "separation of powers does not belie joint action by the three coordinate and coequal branches of government, which are as "interdependent as they are independent". *Banco Popular de Puerto Rico* v. *District Court, supra,* pp. 74–5. In the instant case we have "still another example of joint governmental action which lays bare the fabric of government as a seamless web." *Banco Popular de Puerto Rico* v. *District Court, supra,* p. 82. To the same effect, *Yakus* v. *United States,* 321 U.S. 414; *Youngstown Co.* v. *Sawyer,* 343 U.S. 579, concurring opinion of Mr. Justice Jackson, p. 634; *Winberry* v. *Salisbury, supra,* p. 412; cases cited in text of this opinion preceding footnote 11; Annotation, 79 L.ed. 475, 501; Mars, *The Constitutional Power of Congress Over the Administration of Federal Taxation,* 31 Taxes 503. Compare Ginnane, *The Control of Federal Administration by Congressional Resolutions and Committees,* 66 Harv.L.Rev. 569; Jackson, *Presidential Legal Opinion,* 66 Harv.L.Rev. 1353; Note, *"Laying on the Table"—A Device for Legislative Control Over Delegated Powers,* 65 Harv.L.Rev. 637, 640.

Under the Foraker Act there was much more of an intermingling of executive and legislative power in the government of Puerto Rico than under the Jones Act. For present purposes, it can be said that the latter embodied substantially the same concept of separation of powers which we have just described and which is found today in the Constitution of the Commonwealth of Puerto Rico. *Buscaglia* v. *District Court of San Juan,* 145 F.2d 274 (C.A. 1, 1944); *González* v. *District Court,* 62 P.R.R. 152, 167; *Banco Popular de Puerto Rico* v. *District Court, supra; Cordero, Auditor* v. *District Court,* 72 P.R.R. 354, 356.

1925, and § 34 of Act No. 432 of 1950, pp. 1126, 1142. In addition, the Attorney General was authorized to adopt rules of procedure for jury trials in criminal cases not inconsistent with law. Section 206, Code of Criminal Procedure, 1935 ed.[13]

Despite the specific constitutional requirement that the procedure of the courts shall be determined by the Legislature, the rules which have been adopted pursuant to § 8 of the Code of Civil Procedure have been applied for many years and, so far as we are aware, have never been challenged as an invalid delegation of legislative power. *Cuevas* v. *Hernández*, 53 P.R.R. 878; *Rodríguez* v. *Morales*, 72 P.R.R. 34. On the contrary, our cases have asserted even greater power in the courts. Cases have arisen in this jurisdiction where appellants have failed to comply with rules or statutes requiring that a record on appeal be filed within a certain period in the appellate court. We have held that the latter is empowered to dismiss the appeal under such circumstances in spite of the lack of a provision in the rules or statutes given it such power. In so holding we have relied on § 7 of the Civil Code, 1930 ed., and § 36 of the Code of Civil Procedure, 1933 ed.[14] *Batista* v. *Rivera et al.*, 25 P.R.R.

---

[13] The intervention of the Attorney General was in accordance with § 14 of the Jones Act which put him in charge of the administration of justice in Puerto Rico. 39 Stat. 951, 956.

[14] Section 7 of the Civil Code reads as follows: "Any court which shall refuse to render a decision on the pretext of silence, obscurity or unintelligibility of the laws, or for any other reason, shall be held liable therefor.

"When there is no statute applicable to the case at issue, the court shall decide in accordance with equity, which means that natural justice, as embodied in the general principles of jurisprudence and in accepted and established usages and customs, shall be taken into consideration."

Section 36 of the Code of Civil Procedure reads as follows: "When jurisdiction is, by this Code, or by another statute, conferred on a court or judicial officer, all the means necessary to carry it into effect are also given; and in the exercise of this jurisdiction, if the course of proceedings be not specially pointed out by this Code or the statute, any suitable process or mode of proceeding may be adopted which may appear most conformable to the spirit of this Code."

158; *Cividanes* v. *López Acosta*, 22 P.R.R. 74; *López Zárate* v. *Villabaso*, 12 P.R.R. 52; Dainow, *The Method of Legal Development through Judicial Interpretation in Louisiana and Puerto Rico*, XXII *Revista Jurídica de la Universidad de Puerto Rico* 108, 141.

In the same way, in *Bermúdez* v. *Registrar*, 70 P.R.R. 795, we held that, in view of the failure of the Code of Civil Procedure and the Rules of Civil Procedure to provide a procedure for summons by publication of unknown defendants, the courts may adopt an adequate procedure therefor by virtue of § 36 of the Code of Civil Procedure. The Court of Appeals for the First Circuit expressed a similar view. It indicated that, despite the complete control over procedure vested in the Legislature by § 40 of the Organic Act, Congress in the latter Section "intended merely to provide a basic procedure which, within constitutional and statutory limits, the insular courts, like courts administering the Common Law, could develop as they saw fit." *Mercado Riera* v. *Mercado Riera*, 152 F.2d 86, 93 (C.A. 1, 1945). We thus see that in Puerto Rico the courts were not only given a somewhat limited form of rule-making power by statute, but they were also authorized by § 7 of the Civil Code and § 36 of the Code of Civil Procedure to fill in gaps in such rules and procedural statutes by judicial decisions. *Gen. Motors Acceptance* v. *District Court*, 70 P.R.R. 898, 902 (on motion for reconsideration). [15]

Following the trend which we have described in Part I in the Federal system and in a number of states, Act No. 9, Laws of Puerto Rico, 1941, empowered this Court to make rules of procedure for all the courts of Puerto Rico. Section 1 provided that the rules "shall be sent to the Legislature at its next regular session and they shall not begin to be in

---

[15] *Cf. Rodríguez* v. *Morales, supra*, 37, where we said that Rule 3 of the Rules for the District Courts "is nothing more than a regulation of the exercise of the *inherent* power of the courts to order the dismissal of an action for want of prosecution . . . ". (Italics ours.)

force until the closing of said session." Section 3 provides that all previous procedural statutes shall be considered as rules of the Supreme Court and shall continue in effect unless modified or repealed by rules promulgated under Act No. 9.

We exercised the authority conferred on us in Act No. 9 by adopting 86 rules substantially copied from the Federal Rules and known as "Rules of Civil Procedure." The Rules, found at the end of 60 P.R.R., were submitted to the Legislature which took no action thereon. As a result, they went into effect on September 1, 1943. A number of the provisions of the Code of Civil Procedure and other statutes were superseded by the Rules. *Water Resources Authority* v. *District Court*, 65 P.R.R. 451. On the other hand, the Code of Civil Procedure has remained in effect for certain types of proceedings and for those questions not covered by the Rules. *Puerto Rico Real Estate Corporation* v. *Puerto Rico Planning Board*, 74 P.R.R. 439; *Martínez Fernández & Cía., S. en C.* v. *García*, 68 P.R.R. 363; *García* v. *Central Alianza*, 65 P.R.R. 124.[16]

Act No. 25, Laws of Puerto Rico, 1948, withdrew the rule-making power from this Court. Instead under § 1 we were "empowered to draft and propose" rules of procedure to the Legislature which were to take effect only if they were affirmatively approved by the Legislature. The Rules of Civil Procedure, which had gone into effect in 1943, were continued by § 2 "until modified, amended, or repealed by the Legislature." For obvious reasons, no additional rules were proposed by us in this new role of a drafting agency for the Legislature.

---

[16] Section 33 of the Foraker Act and § 40 of the Jones Act, as we have seen, specifically provided as a matter of constitutional law that the procedure of our courts shall be regulated by the Legislature. And Act No. 9 of 1941 laid down no standards in delegating to us the power to adopt rules of procedure. Yet our Rules of Civil Procedure have never been challenged as an invalid delegation of legislative power. Nor has the contention been made that the Rules, being in substance legislation, should have been submitted to Congress under § 23 of the Organic Act. *Cf. Sibbach* v. *Wilson & Co.*, 312 U.S. 1, 15, footnote 17.

The rule-making power of this Court was rescued from the unfortunate level to which it had sunk in Act No. 25 of 1948 by § 6 of Article V of the Constitution.[17] In its report to the Constitutional Convention, the Judiciary Committee commented on § 8 of the Judiciary Article which it recommended to the Convention. Section 8 thereafter became § 6 in the final form of the Judiciary Article as adopted by the Convention. Section 6 was adopted by the Convention except for a minor amendment not relevant here. The comment of the Committee was as follows:

"The Committee recommends that the power of the Supreme Court to adopt rules of procedure be raised to the constitutional level. This power has already been conferred on the Supreme Court, in different ways, since 1941. Fifteen States of the American Union grant to the Supreme Court this power, *which is considered an appropriate function of the Judicial Branch.*

"As to the power of the Legislative Branch to amend, supplement or repeal at any time, any of the said rules by a law specifically limited to that purpose, this Section follows the provisions in the Constitution of Missouri, South Dakota, Wisconsin and the Philippines. The model Constitution proposed by the National Municipal League also contains a provision similar to the recommended provision.

"The Committee wishes to make clear that the power granted to the Supreme Court to adopt rules of procedure does not include in any way the power, by virtue of these rules, to modify or alter substantive rights.

"See: Vanderbilt, *Minimum Standards of Judicial Administration,* 1949, pp. 91, 142; *Jirsig Cases and Materials on Judicial Administration,* p. 968." (Italics ours.)

It is significant that Vanderbilt, *supra,* p. 91, on which the Committee relies in its report, points out that "regulation of procedure by court rule is not an innovation, but a return to fundamental principles." This was also undoubtedly what the Committee had in mind when it called the rule-making power "an appropriate function of the Judicial

---

[17] Section 6 is quoted in footnote 2.

Branch." The Chairman of the Judiciary Committee, the Honorable Ernesto Ramos Antonini, expressed the same thought in his lucid explanation of this Section to the Convention. He said at p. 172 of the *Diario de Sesiones, Convención Constituyente de Puerto Rico:*

"At present, there is an indication of this proposition on the statute books, but that might well be changed at any time to deprive the Supreme Court of all power to adopt such rules. What we are doing is to elevate to constitutional rank the system, which in some other form has appeared during the last few years in our legislation, so that it will be the Judicial Power itself which adopts the rules of procedure.

"It should be noted that the power was preserved in the Legislative Branch to amend, repeal or supplement the rules adopted by the Supreme Court; in addition, the Supreme Court is also required to submit, at the beginning of each regular session, the rules it has adopted, which will not go into effect until the close of the session. This tends to create, promptly and in a healthy manner, what might be called a system of checks and balances by the Legislative and Judicial Powers as well as the Executive; but certainly in giving the initiative and the power to the Supreme Court in connection with the body of rules, in general, we are convinced that there will develop, in the course of time, a climax [climate?] in connection with the approval of rules, whereby the Legislature will very seldom find it necessary, in any way, by amendment, repeal or supplement, to perform the function of approval of rules of procedure, *which since time immemorial has been an inherent power of the Judicial Power, throughout the history of the world."* (Italics ours.)

The statement of the distinguished Chairman of the Judiciary Committee that the courts have inherent power to adopt their own rules of procedure must be read in its context and in the light of the terms of § 6 of Article V. We agree that he did not mean to say that this power was inherent to the extent that the Legislature was completely excluded from the field of procedure. He was apparently thinking of this inherent power in a more limited sense precisely because § 6, which he was recommending, does give the Legislature

a role, with some limitations, in this field: Once this Court has taken the initiative and submitted rules to the Legislature, the latter may amend, repeal or supplement the rules, provided it passes a special law to that effect.[18]   But it is important for our purposes to bear in mind that the Chairman did recognize that procedural rule-making was basically inherent in the courts.

During the debate on the floor of the Convention no one objected to this concept.[19]   And the authorities on which the Committee relied in its Report and the history of procedure we have set forth in Part I support it.   The terms of § 8, the description of its *modus operandi*, and the characterization of rule-making as inherent in the courts all demonstrate that it was established in the Constitution as primarily a judicial rather than a legislative power.

It is true, as the Chairman pointed out, that § 8 contains a clause which operates as a potential brake on the courts by the Legislature.   But, as he indicates, that provision should be rarely invoked by the Legislature and only for strong motives.   The initiative must come from this Court; the primary duty and responsibility rest upon us; and if some label must be affixed to this power, it is judicial rather than legislative.[20]

---

[18] Delegate Gutiérrez Franqui, an able lawyer who was Vice-President of the Convention and was also Attorney General at the time, stated during the debate that provisions with reference to procedure under § 6 "will have to originate in the Supreme Court." *Diario de Sesiones, supra,* p. 629.

[19] Delegate Reyes Delgado, also an experienced and learned attorney, advocated elimination of the power to adopt rules of evidence from § 6. He preferred to vest that particular function exclusively in the Legislature.   But as to procedure even he pointed out that "The power to make rules of procedure has been inherent in the courts . . .". *Diario de Sesiones, supra,* p. 629.

[20] We have already pointed out the futility of the attempt to establish rigid classifications under the doctrine of separation of powers.   See footnote 12.   But that does not detract from the importance in this particular case of the concept that the procedural rule-making power is basically judicial rather than legislative.

## III

*The Legislature in § 19 of the Judiciary Act authorized this Court to adopt Rules of Procedure on Appeal from the District Court to the Superior Court without submitting them to the Legislature.*

■ Congress approved the Constitution of the Commonwealth of Puerto Rico on July 3, 1952. 66 Stat. 327. The Constitution went into effect in accordance with the proclamation of the Governor on July 25, 1952. During this three-week period, Puerto Rico was on the threshold of a new era in its constitutional history. This is not the place to assess the broader legal and constitutional implications of the Constitution. *Cf. Mora* v. *Torres,* 113 F.Supp. 309 (Dist Ct., Puerto Rico, 1953), affirmed in *Mora* v. *Mejías,* 206 F.2d 377 (C.A. 1, 1953); Magruder, The Commonwealth Status of Puerto Rico, 15 U. of Pittsburgh L. Rev. 1; Gutiérrez Franqui and Wells, *The Commonwealth Constitution,* 285 The Annals, American Academy of Political Science 33, 34, 40; *Comment, Self-Determination: The New Puerto Rico Formula,* 2 American Journal of Comparative Law 54. But we cannot blink the fact that it was necessary for the Legislature, during the short period of time between July 3 and July 25, 1952, to accomplish the urgent and difficult task of adjusting the operations of our government to the new Constitution. Not the least of these problems was the need for a Judiciary Act to fill in the details of the framework established in the Judiciary Article of the Constitution.

The Constitution instituted a number of sweeping changes in our judicial system. At the very outset, in § 2 of Article I of the Constitution, the judiciary was made a *coequal* branch of government together with the executive and legislative branches.[21] The provisions of the Judiciary Article

---

[21] Section 2 of Article I reads as follows: "The government of the Commonwealth of Puerto Rico shall be republican in form and its legislative, judicial and executive branches as established by this Constitution shall be *equally* subordinate to the sovereignty of the people of Puerto Rico." (Italics ours.)

were designed to assure the community of an independent judiciary operating a modern and efficient judicial system and deciding cases promptly on the merits rather than on technical questions of procedure and jurisdiction. *Notes and Comments on the Constitution of the Commonwealth of Puerto Rico,* 86–98.

The tenure of judges was made secure under §§ 8, 13 and 3 of Article V. A pension system for judges was contemplated by § 10 of Article V. The salaries of judges could not be reduced during their terms of office by virtue of § 11 of Article VI. Judges were prohibited from engaging in political activity by § 12. Judges of trial courts could be removed only by the Supreme Court under § 11 instead of, as in the past, by the Governor. Administration of the courts, which had previously been the province of the Attorney General under the Organic Act, 39 Stat. 951, 956, was transferred by § 7 to the Chief Justice; the rules of administration were to be adopted by the Supreme Court without submission to the legislative or executive branches of the government.[22] A unified judicial system for purposes of jurisdiction and administration was created by § 2. And this Court was given the power to adopt rules of procedure and evidence in § 6.

Obviously, it was imperative for the Legislature to enact, in the brief period of three weeks, a new Judiciary Act, to take effect immediately, implementing these changes. This was done by Act No. 11 of 1952. For example, the concept of a unified judicial system for purposes of jurisdiction found in § 2 of Article V was embodied in detail in § 10 of Act No. 11, which went into effect immediately. The result—the elimination of the fatal consequences arising out of the problems of jurisdiction over the subject matter in

---

[22] Section 7 provides that the rules of administration "shall be subject to the laws concerning procurement, personnel, audit and appropriation of funds, and other laws which apply generally to all branches of the government."

our trial courts—is one of the notable achievements of our new judicial system. *Rodríguez* v. *Registrar, post,* p. 669.

In transferring the administration of the courts from the Attorney General to the Chief Justice and the Supreme Court, § 7 of the Judiciary Article took a long step toward the goal of an independent judiciary. Detailed provisions were needed to carry out this new principle of administration of the courts. These are found in the Judiciary Act and also went into effect forthwith. They include provisions for assignment of judges within the Court of First Instance, increase in the number of judges, procedure for removal of judges, selection of subordinate personnel, preservation of records and the functions of the Office of Court Administration. Sections 3, 4, 8, 15, 24–29, of Act No. 11 of 1952.[23]

Another great reform was established in § 19 of the Judiciary Act. Clark and Rogers, *supra,* 61 Yale L.J. 1147, 1161, regard it as "[q]uite probably the change of most importance" in our new judicial system. By § 19 the trial *de novo* on appeal from the District Court to the Superior Court was specifically discarded. It was replaced by a review solely on the record in the District Court.[24] The

---

[23] Shelden Elliott, Director of the Institute of Judicial Administration, has this to say of our Judiciary Act: "In terms of reorganizations effected, and effected in this case in a remarkably short span of time, the Puerto Rican Judiciary Act of 1952 is a notable accomplishment. Implementing the Judiciary Article of the island's new Constitution, it provides a unified and integrated court system, vests plenary power in the Chief Justice to supervise court operations and assign judges, and provides for an administrative director and an office of court administration. The Constitution authorizes the Supreme Court to adopt rules of evidence and procedure as well as rules for court administration." *1952 Annual Survey of American Law* 780.

[24] Section 19 reads as follows:

"*Appeals.*—The right of appeal from any final judgment of the District Court to the Superior Court is hereby established. The procedure on appeal shall be in accordance with the rules established by the Supreme Court. Hearing and decision of such appeals shall be by either three Superior Judges or a single Superior Judge, as the Supreme Court may by rule establish according to the nature of the case or the amount

theory of the Legislature was that replacing the indefensible and wasteful trial *de novo* with an appeal on the record would be fairer and more efficient, would be more in accord with the unification of the judicial system under which the Court of First Instance under § 9 of the Judiciary Act consists of two divisions rather than rigidly separate courts, and would enhance the prestige and dignity of the former municipal court judges. Clark and Rogers, *supra,* 61 Yale L.J. 1147, 1161–5.[25]

involved or other reasonable standard in its discretion; and the Chief Justice may assign the hearing of the cases under such rule if there is doubt or the parties do not agree. Further review thereafter shall be only by certiorari by the Supreme Court grantable by that Court in its discretion.

"Appeal shall be by way of review of the judgment or action of the court from which the appeal is taken and shall not be by way of trial *de novo*.

"In every case the Judge shall provide a record of everything which transpired in the case, which record shall be included in the proceedings, unless the party or parties can prepare a transcript of the evidence. The parties shall, within the time provided by rule of the Supreme Court, notify the Judge of any objection they may have to either the record of the case as prepared by the Judge or the transcript of the evidence. The Judge shall hear and pass on such objections. The Supreme Court shall also provide by rule for granting of new hearings by the District Court upon prompt request in cases where the parties or their counsel have not adequately protected their rights during the original trial of a cause, or where an adequate record has not been provided by the Judge.

"The Office of Court Administration shall provide each part of the District Court with adequate equipment for recording mechanically the incidents of each case. The Judge may use this recording in preparing his statement of what transpired during the trial, and the same shall be sent to the Superior Court together with the judgment roll, whenever any of the parties so requests. The Superior Court shall, whenever it is alleged that the statement prepared by the district judge is incorrect, use the recording to decide the appeal or to order a new trial in the District Court."

[25] Under the old system of appeal from the Municipal Court the term "appeal" was a misnomer; the "appellate" court, the former district court, conducted an entirely new trial on the facts and entered a new judgment of its own. *Pagán* v. *Quiñones et al.,* 13 P.R.R. 307; *Gelabert Hermanos* v. *Córdova, Dist. Judge,* 17 P.R.R. 1153; *Fradera* v. *Morales et al.,* 19 P.R.R. 1064; *Cividanes* v. *López Acosta, supra; People* v. *Romero et al.,* 39 P.R.R. 504; *Fernández* v. *Orcasitas,* 51 P.R.R. 295. *Cf.* § 39 of Act No. 432, Laws of Puerto Rico, 1950.

Unlike all the other provisions of the Judiciary Act, the Legislature found it would not be feasible to make effective immediately the change in the method of review of appeals from the District Court to the Superior Court. Section 37 postponed the effective date therefor until October 15, 1952.[26] Perhaps the principal reason for providing in § 37 for postponement, for this single purpose, of the effective date of the Judiciary Act until October 15, 1952 was to give the Administrative Director of the Courts sufficient time to purchase the mechanical recorders to be used in the District Court, which for the first time became a true court of record. *Actas de la Cámara de Representantes de Puerto Rico, 1952,* p. 476; Clark and Rogers, *supra,* 61 Yale L.J. 1147, 1164, footnote 61.[27]

However, the problem of obtaining mechanical recorders was not the only reason for postponement until October 15, 1952 of the effective date of the new method of review on appeal of the judgments of the District Court. A second reason, more important for our purposes, was that the Legislature established in § 19 some but not all of the procedure which was obviously necessary for the new method of review, which had replaced a trial *de novo* with a true appellate review. We were given the power in § 19 to adopt the remaining rules of procedure necessary for such appeals.

---

[26] Section 37 reads as follows: "This Act, being of an urgent and necessary character, shall take effect as soon as the Constitution of the Commonwealth of Puerto Rico shall become operative, with the exception of Section 19, which shall take effect on October 15, 1952. In the meantime, appeals from the District Court to the Superior Court shall follow the procedure existing on the date of the approval of this Act for appeals taken from the former Municipal Court to the former District Court."

[27] Footnote 61 reads as follows: "In order to provide time for the supplying of some fifty-five machines to the various courtrooms, the Legislature postponed the effective date of this Section to Oct. 15, 1952; meanwhile appeals from the lower court were to follow the former procedure. The rest of the Act took effect with the Constitution, *i. e.,* on July 25, 1952."

But the Legislature realized that we could not adopt such procedure overnight. Consequently, in § 37 it postponed the effective date of the new method of appeal until October 15, a period of approximately three months. During this period the Legislature expected both problems—acquisition of mechanical recorders and adoption of rules of procedure by us—to be solved.

The Legislature said unmistakably and without qualification in § 37 that appeals shall be solely on the record *beginning October 15, 1952*.[28] But the Legislature was aware of two facts: (1) the new method of review could not function without a number of changes in the procedure on appeal; (2) the rules embodying these changes could not be submitted by us at the beginning of the next regular session of the Legislative Assembly on January 12, 1953 if they were to go into effect on the earlier date of October 15, 1952. Obviously, in providing that the new method of review shall begin on Otocber 15, 1952, the Legislature intended for the Rules adopted by us to become effective on October 15, 1952 without submission thereof to the Legislature at the beginning of its next regular session.[29]

The defendant argues that § 2 of the Judiciary Act made it mandatory on us to submit the Rules for Appeals from the District Court to the Superior Court to the Legislature

---

[28] The right of appeals is statutory. The conditions thereof, including the scope of review by the appellate court, are for the Legislature to determine. And the appellant must comply strictly therewith in pursuing his appeal. *Ponce v. F. Badrena e Hijos, Inc.,* 74 P.R.R. 210, 231, footnote 6.

[29] Section 32 of Act No. 11 provides that all cases pending in the former district court on appeal from the former municipal court "shall be allowed an appeal to the Superior Court with a trial *de novo* in accordance with the former law." This confirms our view that under §§ 19 and 37 a new method of review on the record shall obtain as of October 15, 1952 for all cases not then pending on appeal from the former municipal court.

before they could go into effect.[30]  We cannot agree.  Section 2 is a mere reiteration in general terms of the constitutional grant of the rule-making power.  In his article on our Act, Judge Clark so characterizes it.  Clark and Rogers, *supra*, 61 Yale L.J. 1147, 1167.  Such reiteration is a frequent and familiar device.  It serves the useful purpose of bringing together in one document the important provisions of constitution and law relating to the judiciary.  There are a number of other examples of such repetitive provisions in the Judiciary Act which we note in the margin.[31]  Section 2 and these other provisions add nothing to their counterparts in the Constitution.  As already noted, they were inserted for the sole purpose of bringing together in one place the salient features of our judicial system.  Section 2 therefore plays no role in this case.

It is true that the third sentence of § 2 provides that all existing procedural statutes and rules shall remain in effect until modified by us *in accordance with the* Constitution.  But it was superfluous to provide that existing laws and

---

[30] Section 2 reads in part as follows: *"Rule-Making Power.*—The Supreme Court shall adopt for the General Court of Justice rules of evidence and of civil and criminal procedure, as well as rules of court administration, as provided in the Constitution of the Commonwealth.  The rules of administration shall be subject to the laws concerning procurement, personnel, audit and appropriation of funds, and other laws which apply generally to all branches of the government.  All existing provisions by statute or rules governing civil and criminal procedure and of evidence shall remain in effect until modified, supplemented, or amended by the Supreme Court in accordance with the Constitution of the Commonwealth of Puerto Rico."

[31] Section 1 of the Judiciary Act restates the provision in § 2 of Article V of the Constitution establishing a unified judicial system for purposes of jurisdiction, operation and administration.  Section 3 makes the Chief Justice the administrator of the courts, as does § 7 of Article V.  Section 5, providing for the number of Justices of this Court and how we shall sit and decide cases, is identical with § § 3 and 4 of Article V.  Section 7 reiterates our original jurisdiction, as found in § 5 of Article V.  This is also true in part of § 24, providing for impeachment of judges, as compared with § 11 of Article V.  Section 25 provides for the office and manner of appointment of the Administrative Director of the Courts in the same language as found in § 7 of Article V.

rules shall remain in effect until modified.   This was already true not only by implication but also under the specific terms of § 1 of Article IX of the Constitution.[32]   Moreover, in providing that such laws and rules shall remain in effect until modified *as provided in the Constitution*, the third sentence for § 2 was only restating once more the standard laid down in the first sentence of § 2, which itself, as we have seen, was a mere reiteration of § 6 of Article V of the Constitution. The short of it is that the Legislature, in these two general reiterations of our rule-making power found in § 2, was not focusing attention on the narrow question before us.   It left that problem to § 19, which deals specifically with the present case.   And § 19, for the reasons already given, provides that the rules adopted thereunder shall not follow the course established by § 6 of Article V of the Constitution.

In the light of the foregoing, we conclude that § 19 of the Judiciary Act authorized this Court to adopt rules of procedure on appeal from the District Court to the Superior Court without submitting them to the Legislature.

### IV

*Section 19 of the Judiciary Act validly provided some of the procedure and validly authorized us to adopt the remaining necessary rules for procedure on appeal from the District Court to the Superior Court without submission thereof to the Legislative Assembly, despite the provisions of § 6 of Article V of the Constitution.*

The Superior Court held that § 6 of Article V of the Constitution is applicable only to rules relating to the trial of a case; that appeal is not part of a trial; and that therefore the requirement or limitation found in § 6 of Article V for prior submission to the Legislature does

---

[32] Section 1 of Article IX provides in part that "When this Constitution goes into effect all laws not inconsistent therewith shall continue in full force until amended or repealed, or until they expire by their own terms."

not apply to rules of procedure on appeal. The trial court added that appeal is a statutory, not a constitutional, right; that it exists only in the form ordained by the Legislature; and that the Legislature having provided in § 19 that we shall adopt the procedure on appeal from the District Court to the Superior Court without prior submission thereof to the Legislature, such appeals may be exercised only pursuant to the rules we have adopted.

We cannot agree with the premise of the Superior Court that § 6 of Article V does not apply to appeals. This question has arisen in the Federal system precisely because the Enabling Act of Congress empowered the Supreme Court to adopt rules of procedure "of the district courts of the United States . . . ." 28 U.S.C. § 2072. In adopting the Federal rules, this problem was solved by relying on the Enabling Act only for those parts of the procedure on appeal which involved steps to be taken in the district court. Certain other rules concerning appellate practice as such were included; but the authority to adopt them was attributed to other general enabling statutes. Clark, *Power of the Supreme Court to Make Rules of Appellate Procedure*, 49 Harv. L. Rev. 1303; Clark, *Experience under the Amendments to the Rules* 1, 30–35, 1953 Federal Rules of Civil Procedure; *Lopinsky* v. *Hertz*, 194 F. 2d 422, 424 (C.A. 2, 1951), concurring opinion of Judge Clark.

The difference between our constitutional provision and the Federal statute is that there is no such restrictive phrase as procedure "of the district courts" in § 6 of Article V. On the contrary, § 6 states seepingly that this Court shall adopt "for the courts" rules of evidence and of civil and criminal procedure. This was in accord with the concept of "a unified judicial system" and the adoption by us of rules of administration for all the courts. Sections 2 and 7 of Article V. We therefore cannot agree that our rule-making power for procedure on appeal from the District Court to the Superior Court rests solely on the statutory basis of § 19 of Act

No. 11 and could be withdrawn at will by the Legislature. Rather the history of § 6 of Article V, its terms, and the other sections of Article V clearly indicate that our constitutional rule-making power covers all phases of procedure, including appellate procedure.[33] But once we conclude that § 6 is a source of appellate rule-making power, we are faced in the instant case with the problem of determining if the limitation contained in § 6—the requirement of prior submission to the Legislature—applies here.

It would perhaps constitute what Mr. Justice Frankfurter has called "pernicious oversimplification" in the interpretation of statutes to rely in this case on the bare syllogism: (1) the Constitution requires submission of rules of procedure to the Legislature before they can become effective; (2) the rules herein were not submitted to the Legislature; (3) consequently, (a) the rules are not yet in effect, and (b) without such rules, review must be by trial *de novo* and not on the record, despite the clear legislative mandate that review solely on the record shall go into effect without fail on October 15, 1952. We reject the solution of this case by recital of this bare syllogism because the question before us cannot be decided in isolation. On the contrary, in order to reach a proper conclusion, this problem must be examined against the background of the rule-making power of the courts, both in general and in Puerto Rico, and of the circumstances under which § 19 was enacted.[34]

We have seen in Part I that procedural rule-making was originally the province of the courts and that in the twentieth century there has been a return to this fundamental

---

[33] We have seen that as early as 1941 we had statutory authority to adopt rules of procedure for all the courts of Puerto Rico. Act No. 9, Laws of Puerto Rico, 1941; Part II. It is true we did not adopt any rules for procedure on appeal under Act No. 9 of 1941. *Collazo* v. *Puig & Abraham*, 70 P.R.R. 780; *Rodríguez* v. *Fonalledas*, 71 P.R.R. 783. But this was by choice and not because of lack of power.

[34] "Knowledge is essential to understanding; and understanding should precede judging." *Burns Baking Co.* v. *Ryan*, 264 U.S. 504, 520, dissenting opinion of Mr. Justice Brandeis.

principle. While this was taking place, some of the courts asserted that the rule-making power of the courts was inherent in the sense that the legislature was absolutely excluded from this field by the doctrine of separation of powers. This theory is difficult to support historically; and however sound analytically, it has not been true in Puerto Rico, either prior or subsequent to the Constitution. Yet from necessity the courts do have some inherent power in the field of procedure; namely, the power to supply such procedure where it is either completely missing or is inadequately established by statute, provided it is not inconsistent with statutory provisions. And this Court has held that in Puerto Rico procedural gaps may be filled in by judicial decisions by virtue of § 7 of the Civil Code and § 36 of the Code of Civil Procedure. In addition, it is important to note that statutes conferring such rule-making power and containing no standards do not invalidly delegate legislative power. This is because the power to provide procedure for the courts is one which is possessed concurrently by the courts and the legislature; consequently, such a statute is a withdrawal from the field of procedure rather than a grant of power.

In Part II we saw that, after a vacillating history, in Puerto Rico, rule-making by the courts has come into its own. Apart from the power of the judiciary to supply missing procedure under § 7 of the Civil Code and § 36 of the Code of Civil Procedure, here, as elsewhere, the judicial rule-making power has been recognized as a return to fundamental principles and as "an appropriate function of the Judicial Branch." Even more important, this power is established in our Constitution as basically inherent in the courts and primarily a judicial rather than a legislative power.

In Part III we described in detail the practical situation faced by the Legislature in July, 1952. A constitution providing for drastic judicial reforms was about to

go into effect. In order to implement these reforms, it was imperative that legislation be enacted in a few days, to take effect immediately. A new method for review on appeal of district court judgments was included in this legislation. However, the Legislature was aware that replacing trial *de novo* on appeal with review on the record required the procedure on appeal to be recast. Although it provided in § 19 for some of the procedure for these appeals, the Legislative Assembly did not incorporate the complete procedure therefor in the Judiciary Act. If we were compelled to follow § 6 of Article V of the Constitution in adopting the remaining rules of procedure, they could not go into effect until sixty days after the close of the regular session of the Legislative Assembly to which such rules were submitted. Consequently, along with the other reforms in the Constitution and the Judiciary Act which were going into effect immediately, the Legislature provided: (1) the review by record rather than by trial *de novo* shall take effect on October 15, 1952; (2) as new rules of procedure were imperative for this new method of review, this Court shall adopt these rules, presumably by October 15, 1952, to take effect without submission to the Legislature.

We think that under the foregoing circumstances § 19 was valid in authorizing us to adopt rules for appeals from the District Court to the Superior Court without submitting them to the Legislative Assembly. When the Constitution went into effect on July 25, 1952, § 2 of Article V, creating a new judicial system, became effective immediately. It was not subject to any future event; it went into effect at once, together with the other provisions of the Constitution.

The Legislative Assembly therefore had only the short period of three weeks within which to enact a Judiciary Act which would implement the provisions of the Judiciary Article. It is true that under § 1 of Article IX, see footnote 32, previous procedural statutes and rules not inconsistent with the Constitution remained in effect. But, for the reasons

we have indicated in Part III, a number of readjustments were necessary. In Act No. 11 the Legislative Assembly provided for some of these procedural readjustments; it delegated the promulgation of others to this Court.

Section 19 was enacted to take effect October 15, 1952. The argument is made that it is invalid to the extent that it contained procedural provisions which took effect after the effective date of the Constitution without waiting for us to initiate rules of procedure pursuant to § 6 of Article V of the Constitution. It is also contended that in adopting rules as authorized by § 19 we are required first to submit such rules to the Legislative Assembly as provided in § 6 of Article V. But both of these arguments overlook the situation which confronted the Legislative Assembly on July 25, 1952.

No rules came into effect on July 25, 1952 by virtue of § 6 of Article V. On the contrary, § 6 in terms contemplated considerable delay: the rules were to be adopted by us in the future, were then to be submitted to the Legislature at the beginning of a regular session, and were not to go into effect until sixty days after the close thereof. Yet the Constitution provided that the new judicial system shall begin to operate immediately, together with the power of the Legislature to organize the courts in accordance with the Constitution. And the Legislative Assembly exercised the latter power by passing Act No. 11, which went into effect simultaneously with the Constitution.

The problem was that the new judicial system, in order to operate effectively, required some new procedural provisions. The Constitutional Convention and the Legislative Assembly were both aware that the method established by § 6 of Article V could not be utilized for that immediate purpose. Indeed, despite a considerable amount of work and study, this Court is not yet in a position to adopt rules of procedure. Consequently, three years will have elapsed be-

fore the first body of rules of procedure will become effective pursuant to § 6 of Article V. Obviously, the Constitutional Convention did not intend to create a vacuum; it intended for some one to have the power to make those procedural changes which became necessary overnight, pending adoption of the long-range provisions contemplated by § 6 of Article V. To hold otherwise would be to impute to the Convention the intention to establish a period of frozen procedure and stagnation of the judicial system of Puerto Rico during its most dynamic stage.

Section 6 of Article V did not prevent the Legislative Assembly from approving transitory legislation—pending approval of rules by us under § 6—which was imperative for operation of the new judicial system created by the Judiciary Article of the Constitution and the Judiciary Act implementing it. On the contrary, the Constitutional Convention foresaw the problems which would inevitably arise during the transitory period between the effective date of the Constitution and the adoption of rules under § 6 of Article V. To take care of this and other contingencies, Article IX, Transitory Provisions, provided in § 7 that "The Legislative Assembly may enact the laws necessary to supplement and make effective these transitory provisions in order to assure the functioning of the government until the officers provided for by this Constitution are elected or appointed and qualify, *and until this Constitution takes effect in all respects.*" (Italics ours.) Logic and necessity dictate the conclusion that § 7 made it possible for the Legislature to enact the procedure contained in § 19 of Act No. 11, to take effect October 15, 1952, until this Court should have the opportunity to comply with the mandate of the Constitution by adopting rules of procedure pursuant to § 6 of Article V of the Constitution. And we think it is obvious that the Legislative Assembly, the membership of which was unchanged until January 1953, could anticipate the problem and so provide on July 24, 1952 instead of waiting until after the

Constitution went into effect on July 25, 1952 and created the difficulties of adjustment we have described.

The debates in the Constitutional Convention are in accord with the interpretation we have given § 7 of Article IX. It must be remembered that the question before us does not involve the question of transitory provisions in connection with the election or appointment of officials, a question which some of the Delegates discussed in the debate on § 7. Here the problem is transitory legislation, which § 7 authorizes, "until this Constitution takes effect in all respects."

We think the comments of Delegate Trías Monge on § 7 support our position if they are read as a whole and if we bear in mind that the problem before us is the meaning of "until this Constitution takes effect in all respects," and not a question of election or appointment of officers. Delegate Trías Monge said at p. 819 of the *Diario de Sesiones, Convención Constituyente de Puerto Rico*, the following:

"We consider that § 7 of this Transitory Provision is absolutely indispensable. It is a usual section in transitory provisions in State Constitutions. It is specifically drawn from the model of the Constitution of New Jersey and its only purpose is simply to make clear that sufficient power is deposited in the Legislative Assembly, solely for the purpose of providing for an adequate transition between the date on which the Constitution goes into effect and the time at which officials provided for in it are elected or appointed and qualify.

"The contention of my colleague, to the effect that it is impossible for this Constitution to go into effect by stages, seems to us not to be correct, insofar as it is clear that if, for example, this Constitution goes into effect in October, or any date prior to the general elections, or as provided under the Organic Act or as provided under § 10 of these same Transitory Provisions, some of its provisions, by necessity, will not go into effect in all respects in the sense of becoming totally applicable, that is, for example, if as provided for the election of a Governor, within X months of the Constitution's going into effect, and of the members of the Legislative Assembly, then, naturally, that goes into effect; but this aspect is not complied with. It

is the basic purpose of the transitory disposition. The filling of a gap between the moment in which a Constitution goes into effect and the moment in which the officers who are appointed or elected under it qualify.

"*And sufficient power is granted to the Legislative Assembly so that if these Transitory Provisions do not cover all the eventualities which must be covered, the Legislative Assembly shall have sufficient power to do it.* It is clear that we do not have the time here to make a detailed revision of all the statutes of the Legislative Assembly of the People of Puerto Rico. We could simply cover these general aspects of the transition and the implementation of the details of this transition remain, *for a limited period,* in the hands of the Legislative Assembly." (Italics ours.)

The remarks of others who were responsible for § 7 in the committee also justify the position we have taken. Delegate Polanco Abreu said at pp. 819–20 of the *Diario de Sesiones* that "The Committee understands that [Section 7] not only is necessary, but is indispensable, not only that it is not dangerous, but that it is useful for the best development of the mechanism, which will result in the effective application of all the postulates that we are consecrating in the Constitution. . . . This disposition covers any involuntary omission in which we may have incurred in establishing the mechanism for the execution of the provisions of the Constitution. . . . Mr. President, we repeat that the only thing that this disposition intends to guarantee is that we may have incurred in some involuntary omission. In view of the limitations of human knowledge, in view of the fact that we are human beings, that we cannot guarantee that in some transitory provisions we have provided for everything, absolutely everything, not forgetting anything, which is necessary for the execution of the provisions of this Constitution, this is a wise provision. This provision has no scope other than to cover any omission in which we may have incurred."

Delegate Solá Morales confirmed these views. He said

at pp. 821–2: "To supplement the Constitution, as neither an individual nor a Parliament nor a Constitutional Convention, in my judgment, can rely so much on its wisdom, that it is sure that in the limited space of some expressions of a Constitution it is going to cover all the eventualities that may occur and which disrupt the order in any aspect of the Government or of the march of a people in a transition which takes place when a Constitution goes into effect. Clearly the word 'supplement' here implies, before this possible variability of the human being and of men who compose any organism like this, that anything which remains without a provision therefor in these transitory provisions resulting in a problem arising in the life of the people, that an organism like a Legislative Assembly, elected by that same people with sufficient authority, may cover this gap and not permit the people to suffer prejudices in the transition from one government to another."

For the reasons we have stated, we hold that the Legislative Assembly was empowered under the circumstances to establish as a transitory measure the limited amount of procedure for appeals from the District Court to the Superior Court found in § 19 of Act No. 11, despite the fact that § 19 went into effect subsequent to the proclamation of the Constitution, which gave this Court in § 6 of Article V the role of initiating rules of procedure. Once we have reached this conclusion, it follows that the Legislative Assembly, having the power to enact such a transitory procedural measure without reference to § 6 of Article V, could validly delegate to us the transitory power to complete the procedure in § 19 by rules which likewise need not be adopted pursuant to § 6 of Article V. That is to say, once it is conceded that under all the circumstances § 7 of Article IX permitted transitory procedural measures to be adopted by the Legislative Assembly, the latter could delegate unconditionally to us the transitory power to write rules as to the remaining

portions of the necessary procedure, for all the reasons stated in Parts I and II, particularly in that part of the text of this opinion preceding footnote 12. This specific delegation of transitory power has no relation to and should not be confused with the permanent rule-making power of this Court granted by § 6 of Article V of the Constitution. When the Legislative Assembly desired to refer to the latter, it did so—as we have seen in Part III—in § 2 of Act No. 11. The specific delegation of rule-making power to us in § 19 is confined to the special, transitory period through which our judicial system is presently passing...

Our view that § 19 was valid in establishing some procedure for appeals from the District Court to the Superior Court and in delegating to us the power to adopt the remaining procedure by rules without prior submission to the Legislative Assembly, was apparently shared by at least 39 of the members of the Constitutional Convention. These 39 members of the Convention were also members of the Legislative Assembly which enacted § 19. The then Attorney General of Puerto Rico, who was a Delegate to the Convention, made a vigorous plea for approval of the Judiciary Act, containing § 19, at the hearing thereon. *Transcripción del Récord Taquigráfico, Vista Pública, P. de la C.* 14, p. 10 *et seq.* The Chairman of the Judiciary Committee of the Constitutional Convention, who was also Speaker of the House of Representatives of the Legislative Assembly, introduced the Judiciary Act, including § 19, in the House. The then members of this Court participated in the drafting of the Judiciary Act. Clark and Rogers, *supra*, 61 Yale L.J. 1147, 1148–9; Clark, *Report to the Attorney General, Acts, supra*, p. 378. After its enactment, we proceeded to adopt the Rules under § 19 without prior submission thereof to the Legislature.[35] Although these rules were not formally submitted

---

[35] Adoption of the rules by us of course does not foreclose a challenge of their validity by a litigant. *Sibbach* v. *Wilson & Co., supra.*

In our order of October 7, 1952 adopting the Rules involved herein

to the 1953 regular session of the Legislature, the latter was of course aware of their existence. Yet no suggestion was made by the Legislative Assembly or any of its Committees that our action was improper and should be overridden.[36] While it is not conclusive, we think the contemporaneous views we have just recited should be given weight in passing on the validity of § 19. *Cherey* v. *City of Long Beach*, 26 N.E. 2d 945, 949 (C.A., N.Y., 1940); *Platte Valley Pub. Pow. and Irr. Dist.* v. *Lincoln County*, 14 N.W. 2d 202, 205 (S.Ct., Neb., 1944); *Mayor and City Council of Baltimore* v. *Hofrichter*, 11 A.2d 375, 378 (C.A., Md., 1940); *Sanger* v. *City of Bridgeport*, 198 Atl. 746, 749 (S.Ct., Conn., 1938); see *Ex parte Ming*, 181 Pac. 319 (S.Ct., Nev., 1919).

The petition of the defendant for a writ of certiorari will be denied.

---

Mr. JUSTICE BELAVAL, dissenting.

Petitioner herein, Mr. José Celso González Vélez, prays that we set aside an order of the Superior Court of Puerto Rico, Ponce Part, denying a trial *de novo* sought by petitioner in order to perfect his appeal from a judgment rendered against him by the District Court of Puerto Rico.

The principal ground on which he based his petition for certiorari is that the Superior Court of Puerto Rico, Ponce Part, committed a procedural error in deciding that the "Rules for Appeals from the District Court to the Superior Court of the Commonwealth of Puerto Rico," adopted by this Court on October 7, 1952, pursuant to §§ 19 and 37 of Act No. 11 of July 24, 1952 (Spec. Sess. Laws, p. 30) of the former Legislative Assembly of Puerto Rico, effective on October 15, 1952, are not inconsistent with the provisions

---

we were careful to give § 19 of Act No. 11 as the source of our authority to adopt the said rules. We deliberately omitted any mention of § 6 of Article V of the Constitution.

[36] In an analogous situation, the Supreme Court of the United States found that the failure of Congress to interfere with a rule reinforced the validity of the rule. *Sibbach* v. *Wilson & Co., supra*, p. 15.

of § 6 of Article V of the Constitution of the Commonwealth of Puerto Rico, insofar as § 37 of Act No. 11 of July 24, 1952 and Rule 10 of the ·Rules adopted· by this Court on October 7, 1952, provide that the Rules shall become effective on October 15, 1952, whereas pursuant to § 6 of Article V of the Constitution of the Commonwealth of Puerto Rico, they should have become effective "sixty days after the close" of the regular session of the Legislative Assembly of the Commonwealth of Puerto Rico, which began in January, 1953.

The trial judge in this case, J. M. Martín Almodóvar, based his denial of petitioner's motion for a trial *de novo* on the same grounds set forth in a decision rendered in a similar case entitled *The People of Puerto· Rico* v. *Amador Vélez Ramos*, on Assault and Battery, criminal case TS–52 M–30 of the Superior Court of Puerto Rico, Ponce Part. In brief, the findings of the respondent court were the following: (1) the right of appeal from a district court (formerly municipal court) to a superior court (formerly district court) is a statutory right and not a constitutional· right, and therefore, the Legislative Assembly of Puerto Rico had power to establish it in the manner it saw fit; (2) the Legislative Assembly of Puerto Rico could delegate to the Supreme Court of Puerto Rico the power of approving rules in order that the right of appeal established by·virtue of a law could be exercised; (3) irrespective of any legislative authorization, the courts of last resort have inherent powers to approve rules regulating appeals; (4) § 6 of Article V of the Constitution of the Commonwealth of Puerto Rico, insofar as it establishes that the rules of evidence and of civil and criminal procedure adopted by the· Supreme Court must be submitted to the Legislative Assembly at the beginning of its next regular session and shall not go into effect until sixty days after the close of the session, unless expressly disapproved, is not applicable to the rules adopted by the Supreme Court of Puerto Rico to regulate the appeals from

the decision and judgments of the district courts to the superior courts, because the right to appeal is not a constitutional right, it is not in itself a proceeding forming part of the trial, and it may be included in the administrative rules.

The grounds alleged by petitioner in his petition for certiorari and by the trial judge in his decision, compel us to consider the following issues of law: (1) what were the standards established for the legislative reform governing the regulation of the judicial procedures by the judicial branch itself; (2) what is the true scope of the inherent power of the courts; (3) the true nature of the right of appeal; (4) the constitutionality of the statutes which delegate to the judiciary the rule-making power; (5) the possible constitutionality or unconstitutionality of § § 19 and 37 of Act No. 11 of July 24, 1952, known as the Judiciary Act of the Commonwealth of Puerto Rico.

1. When in 1787 the United States of America adopted its Constitution despite Burke's political treatises, Montesquieu's The Spirit of the Laws, Locke's Treatise on Civil Law, and Hobbe's Leviathan, the balance of the apportionment of powers tilted in favor of Congress, following the English precedent which originated a revolution of the bourgeoisie in 1662. See: *The Constitutional History of the United States*—Homer Carey Hockett—*The Macmillan Company*—1939 Ed.

The two Sections of Article III of the Federal Constitution referring to the Supreme Court of the United States, are clear enough:

"Section 1.—The Judicial Power of the United States, shall be vested in one Supreme Court, and in such inferior courts as the Congress may from time to time ordain and establish. The Judges, both of the supreme and inferior courts, shall hold their offices during good behaviour, and shall, at stated times, receive for their services, a compensation, which shall not be diminished during their continuance in office.

"Section 2.—The judicial power shall extend to all cases, in law and equity, arising under this Constitution, the laws of the United States, and Treaties made, or which shall be made, under their authority; —to all cases affecting ambassadors, other public ministers and counsels; —to all cases of admiralty and maritime jurisdiction; —to controversies to which the United States shall be a party; —to controversies between two or more States; —between a state and citizens of another state; —between citizens of different states; —between citizens of the same state claiming lands under grants of different states, and between a state, or the citizens thereof, and foreign states, citizens or subjects.

"In all cases affecting ambassadors, other public ministers and consuls, and those in which a State shall be party, the Supreme Court shall have original jurisdiction. In all the other cases before mentioned, the Supreme Court *shall have appellate jurisdiction, both as to law and fact, with such exceptions, and under such regulations as the Congress shall make.*"

The 73d Congress approved on June 19, 1934—United States Statutes at Large, Vol. 48, Part I, p. 1064—an "Act to give the Supreme Court of the United States authority to make and publish rules in actions at law," which insofar as pertinent reads:

". . . That the Supreme Court of the United States shall have the power to prescribe, by general rules, for the district courts of the United States and for the courts of the District of Columbia, the forms of process, writs, pleadings, and motions, and the practice and procedure in civil actions at law. *Said rules shall neither abridge, enlarge, nor modify the substantive rights of any litigant. They shall take effect six months after their promulgation,* and thereafter all laws in conflict therewith shall be of no further force or effect.

"The court may at any time unite the general rules prescribed by it for cases in equity with those in actions at law so as to secure one form of civil action and procedure for both . . . *Such united rules shall not take effect until they shall have been reported to Congress by the Attorney General at the beginning of a regular session thereof and until after the close of such session.*"

On December 20, 1937—82 L. Ed. 1552 App. IV—the Supreme Court of the United States adopted by an order to that effect, the Rules of Procedure for the District Courts of the United States and authorized the Chief Justice, "to transmit the Rules as adopted to the Attorney General and to request him, as provided in that Section, [§ 2 of the Act of June 19, 1934] to report these Rules to the Congress at the beginning of the regular session in January next."

The 76th Congress approved on June 29, 1940—United States Statutes at Large, Vol. 54, Part I, p. 688—another "Act to give the Supreme Court of the United States authority to prescribe rules of pleading, practice, and procedure with respect to proceedings in criminal cases prior to and including verdict, or finding or plea of guilty" which insofar as pertinent reads:

"That the Supreme Court of the United States shall have the power to prescribe, from time to time, rules of pleading, practice, and procedure with respect to any or all proceedings prior to and including verdict, or finding of guilty or not guilty by the court if a jury has been waived, or plea of guilty, in criminal cases in district courts of the United States, . . . *Such rules shall not take effect until they shall have been reported to Congress by the Attorney General at the beginning of a regular session thereof and until after the close of such session,* and thereafter all laws in conflict therewith shall be of no further force and effect."

On December 26, 1944—89 L. Ed. 2150, App. III—, the Supreme Court of the United States by an order to that effect, adopted the Rules of Criminal Procedure for the District Courts of the United States and authorized the Chief Justice "to transmit the Rules as prescribed to the Attorney General and to request him, as provided in that Act, to report these Rules to the Congress at the beginning of the regular session in January 1945."

As we have seen, one of the principal characteristics of both Acts was that the Rules adopted would not have the force of law until Congress had an opportunity to pass on

them. What could be the reason for thus limiting the delegation of power granted? The enactment of the new Rules undoubtedly set aside all the procedural laws of Congress which were inconsistent with said Rules. It was natural for Congress to be interested in knowing how its own procedural laws would be altered by the new rules of procedure adopted by the Supreme Court.

Section 40 of the Organic Act of Puerto Rico, approved March 2, 1917 (Sess. Laws, p. 6) by the United States Congress, established that in Puerto Rico "the judicial power shall be vested in the courts and tribunals of Porto Rico now established and in operation under and by virtue of existing laws" and that *"The jurisdiction of said courts and the form of procedure in them,* and the various officers and attachés thereof, shall also continue to be as now provided until otherwise provided by law," and that the Legislature of Porto Rico shall have authority, from time to time as it may see fit, not inconsistent with this Act, to organize, modify, or rearrange the courts and their *jurisdiction and procedure.*

Under the power granted by that Article, the former Legislative Assembly of Puerto Rico approved Act No. 9 of April 5, 1941 (Sess. Laws, p. 330). "To Confer on the Supreme Court of Puerto Rico power to promulgate and enforce Rules in judicial proceedings; to authorize the judicial council to act as consulting board in the selection and promulgation of said Rules; to repeal the laws in conflict herewith," which insofar as pertinent reads:

"Section 1.—The Supreme Court of Puerto Rico, through rules which it shall promulgate and put in force from time to time, shall have the power to regulate judicial proceedings in all the courts of Puerto Rico, for the purpose of simplifying them and of promoting the prompt administration of justice. Such rules cannot repeal, amplify, or modify the substantial rights of litigants.

"*After said rules are approved, a copy thereof shall be sent to the Legislature at its next regular session and they shall not begin to be in force until the closing of said session.*

"`. . . . . . .

"Section 3.—Every act in regard to allegations, or judicial practice or procedure in force at the time this Act is approved, shall be considered as a rule of the Supreme Court and shall continue in force as such unless it is modified, amended, or repealed by rules promulgated in accordance with the provisions of this Act."

After the Rules of Civil Procedure for the Courts of Puerto Rico were drafted by this Court, on March 18, 1943, the Chief Justice, Mr. Emilio del Toro, sent the following communication to the Legislative Assembly of Puerto Rico:

"To the Senate and House of Representatives of Puerto Rico Assembled in Regular Session: By order of the Court, and in compliance with the provisions of Act No. 9 of 1941, Session Laws, p. 330, I have the honor to transmit therewith to that Legislature a copy of the Rules of Civil Procedure for the Courts of Puerto Rico, which have been adopted by the Supreme Court pursuant to the said act, to take effect on the 1st of September next." (60 P.R.R. III.)

Since neither the Juridical Committee of the Senate, nor the Civil Juridical Committee of the House of Representatives of Puerto Rico, took any action on the rules, nor were they considered by the Senate of Puerto Rico or by the House of Representatives of Puerto Rico, according to certificates issued by Messrs. Ildefonso Solá Morales and José Enrique Gelpí, 60 P.R.R. IV and V, the Rules took effect on the 1st of September, 1943 in compliance with the provisions of Act No. 9 of 1941 (Sess. Laws, p. 330).

Subsequently, however, the Legislative Assembly of Puerto Rico approved Act No. 465 (Sess. Laws, p. 1356) on April 25, 1946, "To determine that the Rules heretofore promulgated and enforced by the Supreme Court of Puerto Rico shall be the Rules which shall govern the judicial proceedings in all the courts of Puerto Rico; to provide the manner in which said Rules may be amended, and for other purposes," which insofar as pertinent reads:

"Section 1.—The Rules of Civil Procedure for the courts of Puerto Rico promulgated and enforced by the Supreme Court of Puerto Rico shall be the rules governing the judicial proceedings in all the courts and tribunals of Puerto Rico.

"Section 2.—The Rules of Civil Procedure for the courts of Puerto Rico referred to in the preceding section *shall be amended or repealed either on the initiative and by action of the Legislature of Puerto Rico or* in the following manner: whenever in the judgment of the Supreme Court of Puerto Rico it may be necessary to amend or repeal any of the Rules of Civil Procedure for the courts of Puerto Rico, the Supreme Court of Puerto Rico shall, after adopting the proper resolution as regards the amendment or repeal it may consider advisable, *forward certified copy of said resolution to the Legislature of Puerto Rico before the beginning of its regular session immediately following the date on which said resolution is adopted. If the Legislature of Puerto Rico adjourns its said session without taking any action in connection with said resolution, the latter shall be promulgated and enforced by the Supreme Court of Puerto Rico.*

"Section 3.—All laws or parts of laws in conflict herewith are hereby repealed; *Provided, however,* that except as provided in this Act, Act No. 9, approved April 5, 1941, shall remain in full force and effect."

As may be seen, by this second law the former Legislative Assembly of Puerto Rico again promulgated the Rules which were already effective pursuant to the power vested in this Court by the former Act, and now expressly sanctioned its right to amend or repeal them, although they were already promulgated by the Supreme Court of Puerto Rico.

The last statute adopted by the former Legislative Assembly of Puerto Rico is Act No. 25 of April 15, 1948 (Sess. Laws, p. 50), amending the title and §§ 1, 2 and 3 of Act No. 9 of April 5, 1941 (Sess Laws, p. 330), which insofar as pertinent provides:

"Section 1.—The Supreme Court of Puerto Rico is hereby empowered *to draft and propose* to the Legislature rules in judicial proceedings for all the courts of Puerto Rico, for the purpose of simplifying them and of promoting the prompt administration of justice.

"After said rules are drafted by the Supreme Court of Puerto Rico, a copy thereof shall be sent to the Legislature for study and consideration thereby. Said rules shall take effect on the date they are approved, and as amended, by the Legislature.

". . . . . . . . . .

"Section 3.—All laws concerning judicial pleadings, allegations, practice, or procedure in force on the date of the approval of this Act, shall continue in force as such unless modified, amended, or repealed by the Legislature."

"Section 2.—The Rules of Civil Procedure for the Courts of Puerto Rico, approved by the Supreme Court of Puerto Rico under Act No. 9 of April 5, 1941, *shall continue in effect and shall have the force of law until they are modified, amended, or repealed by the Legislature.*

"Section 3.—Act No. 465, approved April 25, 1946, is hereby expressly repealed.

"Section 4.—The Rules of Criminal Procedure for the Courts of Puerto Rico transmitted by the Supreme Court to the Legislature pursuant to Act No. 9 of April 5, 1941, *shall take effect on the date they are approved, and as amended, by the Legislature; Provided,* That the Code of Criminal Procedure of Puerto Rico, 1935 Edition, as subsequently amended, shall continue in full force and have the effect of law until it is modified, amended, or repealed by the Legislature."

A comparative study of the three Acts approved by the former Legislative Assembly of Puerto Rico, Act No. 9 of April 5, 1941, Act No. 465 of April 25, 1946 and Act No. 25 of April 15, 1948, shows beyond any doubt, that in the period of time of legislative action between the first and the last Act, the former Legislative Assembly of Puerto Rico changed its policy in two important points, to wit: (1) that while in the first Act, following the pattern adopted by the United States Congress, it leaves in the hands of the Supreme Court of Puerto Rico a complete procedure for the adoption and promulgation of rules of procedure, subject to an implied approval or an express disapproval, (2) in the last Act the Supreme Court of Puerto Rico is given the initiative in the

598

drafting of the Rules but the Legislative Assembly reserves the right to approve them before they go into effect.

In December, 1951, when the Constitutional Convention of Puerto Rico met to consider the power of the Supreme Court of Puerto Rico for regulating judicial proceedings, the following proposal was submitted:

"The Supreme Court shall adopt for the courts rules of evidence and of civil and criminal procedure which shall not abridge, enlarge or modify the substantive rights of the parties. The rules thus adopted shall be submitted to the Legislative Assembly at the beginning of its next regular session and shall not go into effect until sixty days after the close of said session, unless disapproved by the Legislative Assembly, which shall have the power both at said session and subsequently to amend, repeal or supplement any of said rules by a specific law to that effect."

In discussing the proposition presented to the Constitutional Convention of Puerto Rico, in the session of December 3, 1951, the Hon. Ernesto Ramos Antonini, Chairman of the Judiciary Committee, upon reporting in the name of his committee on this important question, stated:

"The third characteristic is the power vested in the Supreme Court to adopt rules of evidence and of civil and criminal procedure.

"At present, there is an indication of this proposition on the statute books, but that might well be changed at any time to deprive the Supreme Court of all power to adopt such rules. What we are doing is to elevate to constitutional rank the system, which in some other form has appeared during the last few years in our legislation, so that it will be the Judicial Power itself which adopts the rules of procedure.

"It should be noted that the power was preserved in the Legislative Branch to amend, repeal or supplement the rules adopted by the Supreme Court; in addition, the Supreme Court is also required to submit, at the beginning of each regular session, the rules it has adopted, which will not go into effect until the close of the session. This tends to create, promptly and in a healthy manner, what might be called a system of checks and balances by the Legislative and Judicial Powers as well as the Executive; but certainly in giving the initiative

and the power to the Supreme Court in connection with the body of rules, in general, we are convinced that there will develop, in the course of time, a climate in connection with the approval of rules, whereby the Legislature will very seldom find it necessary, in any way, by amendment, repeal or supplement, to perform the function of approval of rules of procedure." (See *Diario de Sesiones de la Convención Constituyente de Puerto Rico*—p. 172, 3d column.)

This proposition with some changes in its original text, but substantially the same, became § 6 of Article V of the Constitution of the Commonwealth of Puerto Rico.

The Constitution of the new political state had not yet been enacted when the former Legislative Assembly of Puerto Rico approved Act No. 11 of July 24, 1952, known as "The Judiciary Act of the Commonwealth of Puerto Rico." Section 37 of the Act provides that the new Act "being of an urgent and necessary character, shall take effect as soon as the Constitution of the Commonwealth of Puerto Rico shall become operative, with the exception of Section 19, which shall take effect on October 15, 1952." The day after its approval the Constitution of the Commonwealth of Puerto Rico went into effect. As may be seen, the approval of the Judiciary Act of Puerto Rico, on July 24, 1952 and the proclamation of the Commonwealth of Puerto Rico, on July 25, 1952, are two simultaneous acts. Pursuant to § 37 of the same Act, the Judiciary Act of the Commonwealth of Puerto Rico went into effect a few hours later, with the proclamation of the new state, except § 19, which was supposed to take effect on October 15, 1952, which leads to the conclusion that the Act was approved to implement Article V of the Constitution of the Commonwealth of Puerto Rico.

If we examine together Article V of our Constitution and the new statute reorganizing the judicial branch of Puerto Rico, as to the rule-making power vested in this Court, we find that § 2 of Act No. 11 of July 24, 1952, instead of establishing legislatively, on the basis of permissible differ-

entiation within the apportionment of powers, a different content from § 6 of Article V of the Constitution, establishes that "The Supreme Court shall adopt... rules of evidence and of civil and criminal procedure . . . *as provided in the Constitution of the Commonwealth.*" And to dispel any doubt regarding the legislative intent, if we may in some way use legislative intent in order to decide the constitutionality of a statute, it further provides in the same § 2: "All existing provisions by statute or rules governing civil and criminal procedure and of evidence shall remain in effect until modified, supplemented, or amended by the Supreme Court in *accordance with the Constitution of the Commonwealth of Puerto Rico.*" When we analyze the possible constitutionality or unconstitutionality of § § 19 and 37 of Act No. 11 of July 24, 1952, we shall have another opportunity to pass on the problem in a more thorough analysis.

2. One of the conclusions of the judgment rendered by the trial court seems to be that courts of last resort have inherent power to regulate any proceeding; and that therefore, the source of their rule-making power does not reside in any constitutional grant or in any legislative grant but in a power traditionally recognized in the courts.

The inherent power of courts is one of those mis-apprehended concepts attached to juridical terminology and which by degrees has become a rule of utility. Sometimes it has supplanted the principle of sufficient power to confront a momentary injustice which could not have been remedied by the incumbent authority with the haste that the case required. Applying the simple methodology offered by the formula of dispersion and reunion of its different units of meaning, we shall try to clarify its true meaning.

Power is always an attribute of sovereignty. From the very moment that politics is separated from theology, all public power is a fact extracted from the political reality lived by each epoch. The basis of all power consists in the voluntary or involuntary self-alienation that man makes of

his individual anarchy, to create the State, following the transcendent plan of man in nature. Man's transcendent plan in nature is to survive. There is no reason why we should attempt an absolute severance of nature and history as other sciences of mankind have been compelled to do. It is enough to state that all that is nature, is borne by man as an organic limitation to his own realization, while all that is history is created by man about him, as an extra-organic aspiration within his transcendent plan of survival. Law is one of those artificial creations within the transcendent plan of survival. Every law is a process of auto-alienation of the sovereignty from life itself, performed by man's political will to create a future for his species. Modern transformation of the so-called "passive obediences," which made possible the appearance of the Holy Roman Empire, the divine rights of kings, and Hobbes' Leviathan, by means of bourgeois revolutions for the securalization of power, brings about the concentration in man of the primary unit of power. Thus, there is no reason, in strict public law, for divesting this resigned anarchist of his sole grandeur amidst the total mystery that surrounds him.

The inherent power of the court does not, as has been believed so often, spring from the very nature of the institution. In strict purity of concepts, institutions have no nature; what they have is history, representations of the historical conscience of each time. To make things depend on their own nature is one of the old tricks of functionalism. But even if we were willing to consider functionalism as a generator of certain extra organic characteristics, which have absolutely no need for the historic conscience of man, it is clear that functionalism does not go beyond its own structure, it places an object in operation within its own structure, and therefore it is a limitation to, rather than enlargement of, the very functional complex. On the other hand, all power is a social phenomenon projected outwardly, to regulate the political life of a historical body. No man-

made institution may operate by itself, self-propelled, unless we are willing to succumb to the former institutional divinizations or to the candid rationalization that law exists independently of man.

On the other hand, as a fact extracted from the political reality of each era, the courts have never possessed an extra-political attribute individualized in such a way as to be independent of the will of the sovereign. The powers exercised by the courts have always been delegated by the sovereign. There have been dark instances in the history of the concept of sovereignty, where at first blush we seem to perceive a power superior to the simple delegation of the sovereign. But the scholars of the law are under an obligation of avoiding confusion by the cunning standards adopted at times by theory in its struggle to belie reality itself. But a moment's reflection makes us realize that this extrapolitical attribute originates at critical times, when the monarch has had to confront the ecclesiastical pretentions shielded by the *Jus Divinum* or the demands of the people against absolute monarchy.

An impartial study of the judicial institution from the time of its occidental origin, the only one which should dwell in our conscience, reveals that the administration of justice was always one of the prerogatives of the sovereign. The confusion that at times we notice in the exposition of public law, emanates from confusing the transformations, through which the power of the sovereign must go with the passing of time, with the transformation of the different institutions which were bound to appear in order to meet a different political reality, during the slow process of disintegration which is part of all sovereign power. This goes to show that the anatomy of the sovereign power is not as it was conceived by some of the commentators of the public law: a body of fixed and immutable principles from which any political formula may be traced. It is a human institution subject to

disintegrations, reintegrations, regressions and transformations, according to the reality of the ruling power in each era.

Another less scientific version of the inherent power of the courts is, that its authority to regulate the judicial proceedings is a traditional power of which it has been divested with the lapse of time. We could never explain with due clearness the ambiguous generalization that this version presupposes, unless we were willing to boldly delve into its roots.

A rule is a coactive enactment made by a body, under delegation of authority vested by a constitution or by a statute. The mandate and the sanction essential to make the juridical norm binding lies in the Constitution or in the statute and not in the rule. We have only to look over any work on the theory of law to realize that the compulsiveness of the juridical norm rests in the acknowledgment of the norm by the subject of law to whom it is directed, man. See Introduction to Law—Sir Paul Vinogradoff—*Fondo de Cultura Económica*—(1952 Ed.)— The only juridical means through which man may express his acknowledgment of the juridical norms which shall regulate his life as a citizen of a state, is a constitution or the statute originated by the system of public petitions. As often as a court should attempt to establish a juridical rule, beyond the constitutional limitations or beyond the system of public petitions, there would arise, in strict law, the anomaly of a non-compulsive rule.

To define what in reality of law constitutes a proceeding is not an easy task. The classical division between rights at law or in equity and actions or remedies would result in too simple a comparison with the procedural complexities of our time. Every day, the changeability of procedure within the substantive and the remedial nomenclature is more evident. No method has achieved a complete severance. It would seem safe to consider every procedure as a mixed institution of substantive and adjective law. This has complicated the

alleged rule-making power inherent in the courts, because by placing procedure in a coalescent zone between the legislative and the judicial power, it would be incumbent on the legislature to formulate that part of the rule which might be of a substantive character while the courts would be confined to formulate, under their inherent power, that part of the rule which might be of an adjective nature.

One of the few aspects of the question where there is a certain consistency of views is that the immanent power of the courts, that is, the power flowing from its own creation as a juridical entity, is limited to the following acts: (1) adoption of rules for its internal organization, such as registry of causes, docketting of cases, perfection of appeals, distribution of work among its officers; (2) protective measures to maintain jurisdiction; (3) coactive measures for the enforcement of its orders and decrees. But, no sooner would the rule transcend the internal organization of the court to the external organization of the political society, than we would be confronted with an authentic question of "procedure" in its dual nature of legislative and judicial norm.

Now then, within the constitutional limitations as well as within the minimum patterns of a statute, the courts are liable to create rules of procedure, properly speaking. The remedial laws never succeed in establishing a complete method to meet all the contingencies which may arise in a juridical conflict. Frequently there are cases where the courts must establish, by judicial decision, standards of procedure that warrant the application of the law to particular facts, in the present as well as in the future, if a situation of identity is produced in the juridical facts. This power derived from judicial practice, properly understood, must not be classified as an immanent power which would require no litigation for its existence, or as a juridical standard of prospective type, but rather as one of those marginal complexes of inter-action

typical of the application of a law which is insufficient to cover concrete controversial issues. The procedure by judicial decision is of a transitory nature; sometimes it merely covers the specific case where it is produced; sometimes it acts as a provisional measure to meet a momentary vacuum created by the corresponding legislation; sometimes the rule established by the courts is so satisfactory that it is allowed to prevail for a long period of time. The rule of a prospective type is generally of a legislative character. For a strict juridical study of some of the afore-mentioned subjects, see: 158 A.L.R. 712, 722 (1945); 110 A.L.R. 22 (1937); *Petition of Florida State Bar Ass'n for the Adoption of Rules for Practice and Procedure*, 21 So. 2d 605, (1905); *Petition of Florida State Bar Ass'n for Promulgation of New Florida Rules of Civil Procedure*, 199 So. 57 (1940).

The rule-making power of the courts is at times made to rest in the usages and traditional customs which prevailed in the former practices of the courts of justice. We do not believe that this is the proper time to attempt a distinction between "tradition" and "history." But of one thing we are certain and that is, that in strict juridical sense the history of the law as a public institution shall always be more significant than the immemorial accounts of some patriarchal usages and patrimonial customs which disappear in the lapse of critical times, as indistinct forms, too rudimentary to make sense within our present conscience. The concept "tradition" cannot be carried through the contemporaneous applications of a science to the absurd limit of fostering a retrogression to the feudal system. We can take a historical point of view, since we are concerned with investigating the development of an institution that has a written memoir, without transgressing the historical limits any further than is necessary to impart sense to our own institutions.

America is a historic body whose modalities of formation and development ought to be examined as an independent

creation, perhaps marginal, of the political background of the European manorial rights. From the Laws of the Indies (1680) until the adoption by the State of New York of the first Code of Procedure (1848), there is a homogeneous impulse in the entire continent to what we might term the codification of the American Procedural law. We have no room to make a comparative study in the two countries most affected by the transition from the Middle Age to the Modern Age, Spain and England, of the implications that the manorial right might have had on American life.

As regards Spain and Puerto Rico, from the beginning of the colonies, the singularity of the American case required an Indies public law. As a question of reality, the law properly Spanish, is used suppletory for matters within the sphere of private law. Vide: *Manual de Historia del Derecho Español en las Indias*—José María Ots Capdequí—Editorial Losada S. A. (1945 Ed.). Our first judicial organization, as something different from the pompous nomenclature of the Indies' public law, begins with the *Real Cédula* of June 19, 1831, for the "Establishment of the Audiencia of Puerto Rico and Mayoralties" and the *Real Cédula* of February 17, 1832 for the installation and organization of the Court of Commerce: See: *The Autos Acordados * of the Royal Audiencia of the Island of Puerto Rico* and the *Reales Cédulas, orders*, regulations, decrees and circulars sent since the establishment of said Superior Court—Rafael García Goyena—Marquez Printing Press (1857 Ed.) The establishment of a judicial system, as we conceive it nowadays, as a separate and independent branch of the sovereign power, takes root in Puerto Rico by virtue of the *Real Cédula* of January 30, 1855 of Queen Elizabeth II. The declaration of policy of that royal letter may be offered as a model of the transformation of the Royal Authority, throughout an American period:

---

* Decisions of the Supreme Court to be observed as a precedent.

"That among the reforms tending to achieve a more beneficial government of the overseas provinces, those concerning the administration of justice deserve special notice. Inveterate abuses and illegal practices which time and private interests have inevitably allowed to denaturalize the best laws, penetrated also in the forum of the colonial provinces, notwithstanding the wise and paternal Law of the Indies, which has undergone clear advances in the various fields of the juridical sciences of which advantage should be taken. After having applied some reforms wherever subversion of the good principles and illegal practices had been more openly manifested, I entrusted My Government to submit to me, after much research and study, a complete system of judicial reform. With this purpose and by My Order, an extensive compilation is being written in the last year where the Royal Pretorial Audiencia of Havana, the abolished chancery of Puerto Príncipe and the other superior authorities of the Island of Cuba, such as the Supreme Court of Justice, in "Chamber of the Indies" and the extinct Royal Council, have voiced their opinions and proposed their reform projects, and in view of the enlightened opinions and valuable data compiled in said record, pursuant to My Council of Ministers, I believe it is timely now to establish the reform, *keeping in mind the consultations made by the* Chancery Audiencias of Puerto Rico and of Manila, at those points wherein the reform could be carried out without inconvenience to these last provinces, so different among themselves due to the diversity of their social constitution and their conditions."

The curious fact about this document is not only that it is a statute of general organization of the overseas provincial judicature, but that it is also a code of procedures. See particularly chapters VIII, IX, X, XI, XII, and XIII.

From the authentic sources of the Puerto Rican historic law, during the initial stage of our judicial institutions, 1831–1855, it clearly appears that our first courts of justice never enjoyed the rule-making power. The *Reales Cédulas* issued between 1832 and 1857, show, on the contrary, elaborate regulation of the Spanish crown on each and everyone of the procedural aspects of the administration of justice. We need not stop long to affirm that in 1898, when the change

of sovereignty took place in our country, Puerto Rico was a totally codified country in substantive as well as in adjective law.

Was the situation between England and the United States any different? One of the most significant events for the subsequent development of the science of law in the Occident is the conquest of England by the Normans (1066). The Normans came to Italy at a time when the commentators of the 11th century had succeeded in re-establishing the prestige of the Roman law; they arrived after having acquired from the French a feudal system superior to the rudimentary political systems that up to then the original Germanic tribes and the Danish invaders had established. It is not strange then, that the political power of England, since the times of William the Conqueror, was integrated by prerrogatives, powers and functions of a king, in the political sense of the word. A detached study of the Witan, or the Council of Sages of former periods, and of the King's Council of the times of William the Conqueror, would reveal that the process of disintegration of the King's Council creates with the lapse of time the Great Council, or the Parliament properly speaking, and the Small Council, or the different judicial bodies which subsist from the time of Henry II (1168) until 1873 and 1875, dates when the famous "Laws of the Judicature" are adopted. See: *El Derecho Anglo-Americano*—Oscar Rabasa—*Fondo de Cultura Económica*, 1944 Ed.

England is a living paradox within the political thought of our time. It is a practical democracy luxuriously clothed with medieval symbols. But let us not deceive ourselves as to the integration of its political power. Despite the paraphernalia of its King, of its spiritual lords, of its chancellor lords, of its lord Chief Justice, the true political power of the empire is vested in Parliament. See Inglaterra, *Apariencia y Realidad*—D. W. Brogan—*Fondo de Cultura Económica* (1944 Ed.) The King may not defeat any of the

"petitions of the people" consecrated in one of the "statutes" of the Parliament. Not even the Judicial Committee of the Private Council, or the Chamber of the Lords, acting as a court of last resort, would have power to invalidate a statute of Parliament. The statute of the Parliament is the Supreme Law of the State. Every reform must originate in Parliament, and despite the amount of vetoes, the will of the Parliament prevails in any public issue, notwithstanding the branch of government to which it belongs. The procedure of invalidation of laws because they are unconstitutional, so familiar to our juridical atmosphere, does not form part of the English democratic process.

Mr. Justice Patterson of the Supreme Court of the United States, speaking in the case of *Vanhorne's Lessee* v. *Dorance*, 2 Dallas 304, 1 L. Ed. 391, (1795), states: " 'The power and jurisdiction of Parliament, says Sir Edward Coke, is so transcendant and absolute that it cannot be confined, either for causes or persons, within any bounds. And of this high court, (the Parliament) he adds, it may be truly said, *Si antiquitatem spectes, est vetustissima; si dignitatem, est honoratissima; si jurisdictionem, est capacissima.* It has sovereign and uncontrollable authority in the making, confirming, enlarging, restraining, abrogating, repealing, reviving, and expounding of laws, concerning matters of all possible denominations, ecclesiastical or temporal, civil, military, maritime, or criminal: This being the place where that absolute despotic power, which must in all governments reside somewhere, is entrusted by the constitution of these kingdoms. All mischiefs and grievances, operations and remedies, that transcend the ordinary course of the laws, are within the reach of this extraordinary tribunal. It can regulate or new model the succession to the crown; as was done in the reign of *Henry* VIII and *William* III. It can alter the established religion of the land; as was done in a variety of instances, in the reigns of King Henry

VIII and his three children. It can change and create afresh even the constitution of the kingdom and of Parliaments themselves; as was done by the act of union, and the several statutes for triennial and septennial elections. It can, in short, do everything that is not naturally impossible; and therefore some have not scrupled to call its power, by a figure rather too bold, the omnipotence of parliament. True it is, that when the parliament doth, no authority upon earth can undo.' (1 Bl. Com. 160.)"

From this excerpt it is obvious that the Power of the English Parliament knows no bounds or restrictions. It is difficult to say what is actually the Constitution of England, because not having been consecrated in any written document, true and exact, it is at the mercy of Parliament. It folds at any governmental demand, it changes and wavers impelled by the breeze of legislative humor and political whim. Some of the justices of England have had the audacity of affirming that a parliamentary law in contravention of natural equity, is void, but this opinion flouts the general position that the validity of a parliamentary act can not be criticized by the Judicial Department. It can not be controverted and it must be obeyed. The Power of Parliament is absolute and transcendental; it is omnipotent in the scale of politics. Furthermore, England has no written constitution; it has no fundamental law, nothing visible, nothing real, nothing true against which a statute may be confronted. Not so in America: Each state of the Union has its Constitution sanctioned in an exact and precise document.

A moderate study of the political nomenclature of the Virginia Company (1612), of the attempt at a biblical community by the Charter granted to the Governor and to the Massachussetts Bay Company (1630), of the Fundamental Orders of Connecticut (1622) and of the Rhode Island Charter (1663), reveals that in the early history of the North American country the legislative and judicial functions were

jointly exercised by the same public body and that from the very moment of the Anglo-American colonization, public law searches for new forms of integration, following the religious, social and economic plan contemplated by the several original charters, and it is only on questions of private law where the English common law is accepted as a supplementary law, like the *Ordenamiento de Alcalá* in the Spanish colonization, up to 1505, the *Leyes de Toro* up to 1567, *Nueva Recopilación* up to 1805, and after 1805 the *Novísima Recopilación*. As to the power of the courts to regulate the judicial proceedings which is what concerns us now, in England itself, and already in 1828, when the 9th edition of Tidd's Practices is published "the practice and procedure in the courts of England had long been a mixture of Acts of Parliament and court-made rules."

The more responsible interpreters of the political controversy originating in 1786 and 1787 on the apportionment of powers for the new American Constitution, agree that the judicial power is organized within the Constitution, surrounded by an atmosphere of suspicion and distrust, against what at that time was regarded as a possible "judicial despotism," which should break down the Jeffersonian formula for the republic. We were not to expect therefore, as has been insistently implied, that the judicial power came out triumphant from the debate. On the contrary it came out quite damaged. See: *Readings in Jurisprudence and Legal Philosophy*—Morris S. Cohen and Félix S. Cohen—Prentice Hall Inc., (1951 Ed.), chapter *Law and Politics*, § *Separation of Powers*, subtitle *The Power of Judicial Review*, p. 885.

A commentator of the Federal Constitution as trustworthy as Chief Justice Charles Evans Hughes, subsequently warns us that the authority attached to the Supreme Court of the United States by public opinion rests on the following pillars: (1) from the outset it confined itself to its judicial duty of deciding actual cases and refused to declare opinions

on national subjects not growing out of a case before it; (2) it would not deal with questions purely political in their nature; (3) it has never undertaken to decide questions of the constitutional validity of legislation, unless such questions were necessarily presented and the determination of unconstitutionality could not be avoided and above all, (4) it has not sought to aggrandize itself at the expense of either legislative or executive power. See: *The Supreme Court of the United States*—Charles Evans Hughes—*Fondo de Cultura Económica* (1946 Ed.)

After the adoption of the Constitution of the United States (1787–1788), there is no doubt that under the new plan of distribution of powers, the power to prescribe proceedings is lodged in the Congress of the United States—*Williams* v. *Powers*, 135 F. 2d 153, 156 (1943)—and that when the Supreme Court of the United States has availed itself of any rule-making power it has done so on question not covered by specific congressional legislation or delegation: Act of August 23, 1842–5, Statutes at Large, 516, 518– on the power to enact equity rules and of admiralty; Act of July 1, 1898 —30 Statutes ·at Large, 544, 554, § 30—power to enact rules on bankruptcy proceedings; Act of March 4, 1909— 25 Statutes at Large, 1082, § 25—power to regulate the registry of scientific and artistic property; Act of March 3, 1911—36 Statutes at Large,. 1087, 1148, § 206, Act to codify, review and amend the laws concerning the judicature.

Summarizing as a whole: (1) as a fact extracted from the political reality of each period, the courts have never possessed a single attribute of sovereignty granting them a power superior to the power delegated by the sovereign; (2) the confusion sometimes prevailing in the study of the judicial power, springs from confusing the transformation, of which the unitary power of the sovereign is susceptible in the course of time, with the transformations of the different institutions created for the distribution of the sovereign

power; (3) a rule of procedure is a coactive enactment elaborated by a body, by virtue of the delegation of authority granted by a Constitution or by a statute, and the mandate and the sanction required to make the rule of procedure binding should rest in the Constitution or in the statute, and not in the rule; (4) every day the mobility of the procedure within the substantive and the adjective nomenclature become more evident, it being a safer position to consider all procedures as a mixed institution of substantive and remedial law; (5) even if we admitted that the immanent power of the courts were sufficient to regulate the purely remedial aspects of procedure, they would never have the power to regulate those substantive aspects which abridge, enlarge, or modify the substantive rights of the parties; (6) the immanent power of the courts, that is, the power flowing from its own creation as a public body, is limited to the adoption of rules for its internal organization, protective measures to maintain its jurisdiction, and coactive measures to enforce its orders and decrees, but at the very moment when the rule transcends the internal organization of the court to the public organization of the state, we are facing an authentic question of procedure in its dual nature of legislative and judicial rule; (7) in any aspect that the procedure is a substantive rule which abridges, enlarges, or modifies substantive rights of the parties, the courts would never have immanent powers to regulate the judicial procedures; (8) the transitory rules of procedure established by judicial decision, which arise in the determination of cases, should not be confused with the alleged immanent power of the courts to regulate procedures; (9) traditionally courts in Puerto Rico never had the power to regulate procedures; if any American state had the power, it is an isolated case, by exception, rather than the patrimonial custom of the republic; (10) any power to regulate procedures of the courts, is a power delegated by the sover-

eign by way of a constitution or a statute, and not a power flowing from its own creation as a public body.

3. Another finding of the court seems to be, that since the right of appeal is not constitutional but statutory, nor constitutes in itself a procedure which forms part of the trial, it may be comprised within the rules of administration.

We are facing a rather dangerous rationalization of concepts which, whether considered in the light of a possible induction for future legislative or judicial norms or as a simple exposition of a judicial criterion, may entail a severe damage to the sense of values of the Puerto Rican civilization. No system of public justice will be well balanced unless any judicial error, both in the weighing of the facts and in the application of the law, may be corrected in the most complete and effective manner, by the appellate bodies.

The right of appeal has a scientific function superior to the simple rule of administration: (1) it serves as a safeguard of liberty, of social justice and of the spirit of enterprise of the subject of law, within constitutional limits; (2) it serves as a means to maintain the purity of the constitutional procedures, by the supervision under greater technical knowledge; (3) it serves as a bulwark against judicial anarchy which would suppose an unequal practice of procedure, imposed by each court arbitrarily, by the maintenance of an equal system of principles judicially established; (4) it serves to develop the greatest certainty possible, for the application as well as for the interpretation of those statutes, which must be clarified by judicial standards binding all the courts of minor rank; (5) it serves to maintain an ethical tradition which frees the subject of the law from caprice, from the obfuscation or from the passion of public judges. See: *Criminal Appeals in America*—Lester Bernhardt Orfield—Little Brown and Company (1939 Ed.)

The same confusion is presupposed by the judgment as to the constitutional nature or the statutory nature of the

right to appeal. Constitutional rights are general rules the specialties of which must be prescribed by the corresponding statutes. It is a legislative obligation to furnish the corresponding legislation in order to make feasible the enjoyment of those rights. It is a judicial duty to see that the special rules of a legislative type which are adopted for the enjoyment of the constitutional rights, do not adulterate or evaporate the substances and the essence of those constitutional rights. Although it is true that ordinarily the right of appeal is not a constitutional right, in the sense that it has not been included as one of the inalienable rights of the Constitution, it is nonetheless true that as soon as the right of appeal is incorporated into a system of public justice, by legislative action, it becomes a part of due process of law, and therefore, acquires a quasi-constitutional category. This has been the position assumed by the Supreme Court of the United States since 1915: *Frank* v. *Mangun*, 237 U. S. 308, 59 L. ed. 969 (1915) ; *Cochran* v. *Kansas*, 316 U. S. 255, 86 L. ed. 1453, (1942) ; *Denial of Appeal*, 19 A.L.R. 2d 792, 795, 808, (1951) ; *Bovkin* v. *Huff*, 121 F. 2d 865 (1941).

The right of appeal is a procedure and not an administrative rule "... procedure is defined as everything methodical and regulatory in the courts, from the inception of a suit to the entry of final judgment, *including appellate action*."—Vanderbilt—*Standards of Judicial Administration* —p. 92 (1949). As a matter of fact, the appellate action was included in the rules adopted by the United States, Supreme Court for the districts court of United States by virtue of the delegation of power granted to it by the United States Congress. Fortunately, the delegates of our own "Constitutional Convention" took care of duly clarifying the difference existing between an administrative rule (§ 7 of Chapter V) and a rule of procedure or evidence (§ 6 of Chapter V).

4. Generally speaking the rule-making power is a legislative power—*Williams* v. *Power*, 135 F. 2d 153 (1943); *Sibbach* v. *Wilson & Co.*, 312 U. S. 6, 85 L. ed. 479 (1940). Any. rule adopted by a court inconsistent with a statute does not have the force of law. *Alaska Packers Asso.* v. *Pillsbury*, 301 U. S. 174, 81 L.. Ed. 988 (1937). Within the system of apportionment of powers it is possible that the rule-making power traditionally vested in Congress be delegated to courts of justice—*The Bank of the United States* v. *Halstead*, 10 Wheat 51, 6 L. Ed. 264 (1825); *Beers et al.* v. *Haughton*, 9 Peters 329, 9 L. Ed. 145, (1835); *Cooke* v. *Avery*, 147 U. S. 375, 37 L. Ed. 209 (1893); *Delegation of Legislative Power*, 79 L. Ed. 474, 500; *Petition of Florida State Bar Ass'n for the adoption of Rules for Practice and Procedure*, 21 So. 2d 605, (1945).

Now then, when the Constitution establishes the method to adopt rules of procedure, the constitutional method prevails, notwithstanding the legislative attitude or the judicial action. The reason is that legislature as well as judicatures, are filial creations of the very Constitution:

"What is a constitution? It is the form of government, delineated by the mighty hand of the people, in which certain first principles of fundamental laws are established. The constitution is certain and fixed; it contains the permanent will of the people, and is the supreme law of the land; it is paramount to the power of the legislature, and can be revoked or altered only by the authority that made it.

"The life-giving principle and the death-doing stroke must proceed from the same hand. What are legislatures? Creatures of the constitution; they owe their existence to the constitution: they derive their powers from the constitution: it is their commission; and, therefore, all their acts must be conformable to it, or else they will be void. The constitution is the work or will of the people themselves, in their original, sovereign, and unlimited capacity. Law is the work or will of the legislature in their derivative and subordinate capacity. The one is the work of the Creator, and the other of the creature. The constitution fixes limits to the exercise of legislative

authority, and prescribes the orbit within which it must move. In short, gentlemen, the constitution is the sun of the political system, around which all legislative, executive and judicial bodies must revolve. Whatever may be the case in other countries, yet in this, there can be no doubt, that every act of the legislature, repugnant to the constitution, is absolutely void." *Vanhorne's Lessee* v. *Dorrance, supra*.

5. Act No. 11 of July 24, 1952, known as the Judiciary Act of the Commonwealth of Puerto Rico, brings to Puerto Rico the English reform of 1873 and 1875. One of the best commentators on Anglo-American law, Oscar Rabasa, in his narrative and comparative study of the "Common Law" states; "after 1873... by virtue of the legislative reforms issued by the Parliament called 'Laws of the Judicature' and promulgated in 1873 and 1875, a radical transformation overcame the organization of the judicial power of England. All the courts of first and second instance... and others which operated separately, merged into a single uniarial jurisdictional body where practically the entire judicial power is lodged: the Supreme Court of the Judicature (read General Court of Justice of Puerto Rico),...and the Appellate Court," (read Supreme Court of Puerto Rico). The High Court of Justice is organized in five "divisions," or we could call them Sections, composed, respectively, by each one of the aforesaid courts of first instance which were merged therein, to wit: the Chancery Division (jurisdiction in equity of the former district courts of Puerto Rico), the King's Bench Division (jurisdiction in damages, eminent domain, in criminal causes and in extraordinary remedies, and special legal proceedings of the former districts courts of Puerto Rico), Court of Common Pleas, (jurisdiction of the former municipal courts of Puerto Rico), the Exchequer Division (jurisdiction corresponding to the former Tax Court of Puerto Rico) and the Probate, Divorce and Admiralty Division (jurisdiction in family relations of the former district courts of Puerto Rico) ... Thus, the High Court of

Justice, first part of the Supreme Court of the Judicature, (read Court of First Instance of Act No. 11 of July 24, 1952), assumed full jurisdiction in first instance in all the branches of the English penal, civil, fiscal or administrative, and commercial law and all the subject matter embraced by the law-equity, (reference to § 10 of Act No. 11 of July 24, 1952) ... as a general rule a single judge of any courtroom is enough for the functioning thereof and to exercise the authority vested in the High Court, but for other matters only the court in full may take cognizance thereof, before two or more magistrates, who may be transferred from one Section to another, (reference to §§ 3 and 19 of Act No. 11 of July 24, 1952.)

The Appellate Court (read Supreme Court of Puerto Rico), second great branch of the Supreme Court of the Judicature, reviews on appeal from second instance all the final decisions rendered by the High Court of Justice (read Court of First Instance) in full or through each one of its Sections, and of the ones rendered by the rest of the lower courts of England. ... Three justices are enough to constitute quorum in this Court which generally acts in two divisions or Sections... (reference to § 5 of Act No. 11 of July 24, 1952)." The right to review established by § 19 of our Act No. 11 is identical with the writ of error which was granted in the English judicial organization prior to 1873 in order to appeal from a case decided by the Court of Common Pleas (read former municipal courts of Puerto Rico), to the Kings Bench (read former district courts of Puerto Rico). See: Oscar Rabasa *El Derecho Angloamericano*, Chapter "*La Organización Judicial y los Tribunales en el Derecho Inglés*," pp. 99, 102.

As we have previously stated, Act No. 11 of July 24, 1952, is the Act adopted by the former Legislature of Puerto Rico to implement Article V "Of the Judicial Power" of the Constitution of the Commonwealth of Puerto Rico. As to the

power to regulate procedures, undoubtedly no delegation of authority vested in this Court by the former Legislature of Puerto Rico could be valid over the method adopted by the very Constitution, since § 1 of Article IX on "Transitory Provisions" of the Constitution provides that when the Constitution goes into effect, only those laws not inconsistent therewith shall continue in full force.

The method adopted by the Constitution is clear: the initial rule-making power is vested in the Supreme Court, as long as the substantive rights of the parties are not abridged, enlarged or modified, but the rules of procedures shall be submitted to the Legislative Assembly, at the beginning of its next regular session, and shall not go into effect until sixty days after the close of the session, unless expressly disapproved. It is convenient to make clear the following points: (1) the rules of procedure contemplated by the Constitution are those which were originally adopted by the Legislature, that is, prospective rules which have nothing to do with the suits submitted to judicial decision, within the sphere of judicial function, properly speaking; (2) in limiting the constitutional grant to those rules which do not abridge, enlarge or modify the substantive rights of the parties, the safest method to adopt any rules of procedure is to submit them to the legislative judgment to sanction any abridgment, enlargement or modifications of substantive rights implicitly affected by the new regulation; (3) the remittance of the rules of procedure adopted by this Court to the next regular session of the Legislature, is a part of the constitutional method provided for the promulgation of such rules.

In this case, the former Legislative Assembly of Puerto Rico delegated to this Court the adoption of a body of rules to regulate the appeals from the District Court to the Superior Court, § 19 of Act No. 11 of July 24, 1952. Since appeal is a part of the judicial proceeding properly speaking, § 19 is not unconstitutional insofar as it delegates a power, which

the day after the approval of the Act belonged exclusively to the Supreme Court of Puerto Rico, by virtue of the constitutional mandate sanctioned in § 6 of Article V of the Constitution of the Commonwealth of Puerto Rico.

The conflict between the law and the Constitution is produced by virtue of § 37, which provides: "This Act, being of an urgent and necessary character, *shall take effect as soon as the Constitution of the Commonwealth of Puerto Rico shall become operative, with the exception of Section 19*, which shall take effect on October 15, 1952. In the meantime, appeals from the District Court to the Superior Court shall follow the procedure existing on the date of the approval of this Act for appeals taken from the former Municipal Court to the former District Court."

As may be seen, § 37 of Act No. 11 of July 24, 1952, is in conflict with the same Constitution which it attempts to implement, in two aspects: (1) immediately after the Constitution became effective, the Legislative Assembly lost its traditional power of regulating prospective procedures and therefore, the power to regulate any prospective procedure belonged to the Supreme Court of Puerto Rico; so that, it was delegating a power which no longer belonged to it; (2) immediately after the Constitution went into effect, the constitutional method provided for the promulgation of new rules was enforced and therefore, the Legislature could not establish on its own account a different method of promulgation without being in conflict with the Constitution, since § 1 of Article IX of the Constitution provides, that when the Constitution goes into effect, only those laws not in conflict therewith shall continue in force.

A detached study of § 6 of Article V of the Constitution requires us to reach two unavoidable conclusions: (1) that the faculty to adopt any rule of procedure which does not abridge, enlarge or modify a substantive right, belongs exclusively to the Supreme Court of Puerto Rico; (2) that the

power to adopt any rule of procedure that abridges, enlarges or modifies a substantive right, belongs exclusively to the Legislative Assembly of the Commonwealth of Puerto Rico. The only way to harmonize these two contradictions, product of a language which obeys a different constitutional policy within the classic apportionment of powers, is by adopting a standard of strict collaboration between the judicial and the legislative branches, the former reserving the right, insofar as possible, of proposing the remedial reforms and the latter, insofar as possible, the power to sanction them, for otherwise, in such a difficult matter as that of distinguishing between the adjective and the substantive nature of a juridical standard, the interpretation of our own Constitution could become a place of niceties. Any unavoidable incorporation of a substantive right into any rule of procedure would be sanctioned by the simple remittance of said rules to the Legislative Assembly of Puerto Rico.

The possible power of the Legislative Assembly to authorize this Court to enact rules of procedure, without need to comply with the provisions of § 6 of Article V of our Constitution, as a transitory measure for complementing and making effective the provisions of § 2 of Article V itself, has been the object of study in this case. The reasoning which that conclusion has produced may be sketched as follows: On July 25, 1952, § 2 of Article V of the Constitution, which establishes that "The courts of Puerto Rico shall constitute a unified judicial system for purposes of *jurisdiction, operation* and *administration*" became effective, on the one hand, and on the other, § 6 of Article V of the Constitution which provides that "The Supreme Court shall adopt for the courts rules of evidence and of civil and criminal procedure which shall not abridge, enlarge or modify the substantive rights of the parties," which rules thus adopted, shall be remitted for approval to the Legislative Assembly at the beginning of the next regular session and shall not go into effect until

sixty days after the close of the session: that precisely because those provisions became effective simultaneously, it would have been impossible to implement § 2, creating the unified judicial system, in all matters concerning the new rules of procedure, by the method used for the promulgation of the rules of procedure established by § 6 of the same Article; that this being so, any of the constituted powers should have sufficient faculty to face the anomalous situation created by the very Constitution; that the "Transitory Provisions" appearing in Article IX of the Constitution itself, specially in § 7, granted the Legislative Assembly of Puerto Rico power to approve the laws necessary for the purpose of making effective § 2 of Article V, and that therefore, it had temporary authority to authorize in turn, the Supreme Court of Puerto Rico, to establish rules of procedure, without need of submitting them to the Legislative Assembly of the Commonwealth of Puerto Rico; that the rules thus adopted could be considered as provisional or transitory measures that would be in force until the final rules of procedure were promulgated pursuant to the new method of constitutional promulgation.

Would it have been impossible to enforce § 2 merely because § 6 determined a different method of promulgation for any rule of procedure? *A unified jurisdiction* existed in Puerto Rico ever since the approval of Act No. 432 of May 15, 1950. Did the *unified functioning* become totally frozen merely because an appeal was brought by way of a trial *de novo* instead of by a writ of *review?* What insurmountable impediment against a *unified administration*, did a slight procedural change, which is essentially of a legislative nature, and has nothing to do with the normal administration of the courts, represent? The best proof of the inconsistency of said reasoning is the very Act No. 11 of July 24, 1952, known as the Judiciary Act of the Commonwealth of Puerto Rico, which became operative July 25, 1952, in everything con-

cerning the *unified jurisdiction* with the *unified functioning* and with *the unified administration,* and had a *trial de novo* until October 15, 1952, and *writ of review* after October 15, 1952, without the judicial structure created by our Constitution becoming disintegrated.

The presumptive power of the former Legislative Assembly to authorize this Court to establish rules of procedure, without submitting them to the present Legislative Assembly of the Commonwealth of Puerto Rico, is grounded on the "Transitory Provisions" of our Constitution. In order to present a complete picture of the polemic, we are going to cite all the "Transitory Provisions":

"Section 1.—*When this Constitution goes into effect* all laws not inconsistent therewith shall continue in full force until amended or repealed, or until they expire by their own terms.

*"Unless otherwise provided by this Constitution,* civil and criminal liabilities, rights, franchises, concessions, privileges, claims, actions, causes of action, contracts, and civil, criminal and administrative proceedings shall continue unaffected, *notwithstanding the taking effect of this Constitution.*

"Section 2.—All officers who are in office by election or appointment *on the date this Constitution takes effect* shall continue to hold their offices and *to perform the functions thereof in a manner not inconsistent with this Constitution,* unless the functions of their offices are abolished or until their successors are selected *and qualify in accordance with this Constitution and laws enacted pursuant thereto.*

"Section 3.—Notwithstanding the age limit fixed by this Constitution for compulsory retirement, all the judges of the courts of Puerto Rico who are holding office *on the date this Constitution takes effect* shall continue to hold their judicial offices until the expiration of the terms for which they were appointed, and in the case of Justices of the Supreme Court during good behavior.

"Section 4.—The Commonwealth of Puerto Rico shall be the successor of the People of Puerto Rico for all purposes, including without limitation the collection and payment of debts and liabilities in accordance with their terms.

"Section 5.—When this Constitution goes into effect, the term 'citizen of the Commonwealth of Puerto Rico' shall replace the term 'citizen of Puerto Rico' as previously used.

"Section 6.—Political parties shall continue to enjoy all rights recognized by the election law, provided that *on the effective date of this Constitution* they fulfill the minimum requirements for the registration of new parties contained in said law. Five years after this Constitution shall have taken effect the Legislative Assembly may change these requirements, but any law increasing them shall not go into effect until after the general election next following its enactment.

"Section 7.—*The Legislative Assembly may enact the laws necessary to supplement and make effective these transitory provisions in order to assure the functioning of the government until the officers provided for by this Constitution are elected or appointed and qualify, and until this Constitution takes effect in all respects.*

"Section 8.—If the Legislative Assembly creates a Department of Commerce, the Department of Agriculture and Commerce, shall thereafter be called the Department of Agriculture.

"Section 9.—The first election under the provisions of this Constitution shall be held on the date provided by law, but not later than *six months after the effective date of this Constitution.* The second general election under this Constitution shall be held in the month of November 1956 on a day provided by law.

"Section 10.—This Constitution shall take effect when the Governor so proclaim, but not later than sixty days after its ratification by the Congress of the United States."

After examining § 10 of these "Transitory Provisions" together with the other Sections thereof, it is clear that as soon as the former Governor of Puerto Rico, who pursuant to § 2 of the very "Transitory Provisions" becomes the Governor of the Commonwealth of Puerto Rico, proclaimed the effectiveness of the Constitution, all the provisions of the Constitution would take effect simultaneously.

What was, in actual law, the authority that the "Transitory Provisions" granted to the Legislative Assembly? Mr. Santiago Polanco Abreu, Member of the Committee of Transitory Provisions and General Matters of the Constitu-

tional Convention of Puerto Rico, upon informing the Convention on the scope of that authority, stated the following:

"The Legislative Assembly, naturally, *would not have power to complement the Constitution* itself, but it would have power *to insure the functioning of the government until the officers provided for by this Constitution are elected or appointed* and qualify."

As may be seen, the authority granted to the Legislative Assembly, by the very text of § 7 of Article IX, was not meant to approve the laws necessary to complement and enforce the Constitution, for this would be illogical and incomprehensible, but to approve "*the laws necessary to complement* and make effective these *transitory provisions*" which is the logical and comprehensive thing, within the transition which expressly bears a provision of this nature.

However, how long would this authority of the former Legislative Assembly last? The best statement on that particular is expressed by the delegate José Trias Monge, before the Constitutional Convention:

"We consider § 7 of this transitory provision as absolutely indispensable. It is a usual Section in transitory provisions of state constitutions. This Section is specifically copied from the model of the New Jersey Constitution and its *sole purpose* is simply to make clear that it grants sufficient constitutional power to the Legislative Assembly, *solely* for the purpose of providing for an adequate transition *between the time when the Constitution becomes effective and the time when the officers* provided for thereunder *are elected or appointed and qualify*... It is the basic purpose of a transitory provision: *to fill the gap between the time when the Constitution takes effect and the time when the officers that are appointed or elected under it qualify.*"

(Vide *Diario de Sesiones* of the Constitutional Convention of Puerto Rico, p. 819.)

To meet the true scope of the temporary power vested in the former Legislative Assembly, as well as to meet the implications of the development of that power in the future,

after the adoption by the Constitutional Convention of the "Transitory Provisions," we must clearly establish that: (1) the power granted to the Legislative Assembly was solely to adopt those laws which would make feasible the politic organization of the new state created by the very Constitution, and (2) the period of transition covers from July 25, 1952, the date when our Constitution is made effective, until January 12, 1953, the date when the last officers elected, within the new politic organization, qualify. It is clear that whatever laws were adopted to take effect after January 12, 1953, *are exclusively such laws as are connected with the organization of the new politic status*, and refer to the appointment or election of the new officers, because that was the true delegation of constitutional power.

But a curious fact about this case is that it was not the former Legislative Assembly, acting under the temporary power granted to it by the "Transitory Provisions" of Article IX, after July 25, 1952, which approved the Judiciary Act, but the former Legislative Assembly, acting under the permanent power granted to it by the Organic Act of 1917, which approved the Act, on July 24, 1952. Under the permanent provisions of the Organic Act of 1917, the former Legislative Assembly had power to establish procedures, and therefore, possibly, power to delegate such authority in any statute fixing the minimum standards for such delegation. However, the same former Legislative Assembly, acting under the "Transitory Provisions" of our Constitution, would not have been entitled to regulate procedures, and therefore, could not have delegated such power. An insight into that power would be sufficient to drop out the Judiciary Act from the "Transitory Provisions" of our Constitution.

The true problem which this Court now faces concerning said "Transitory Provisions" is that the Judiciary Act having been approved to become effective together with our Constitution, it becomes an Act inconsistent with the very Con-

stitution, as soon as the latter takes effect, pursuant to the first paragraph of § 1 of the "Transitory Provisions," in all those matters contemplating a delegation of the rule-making power to our Court, without submitting such rules to the approval of the next Legislative Assembly of the Commonwealth of Puerto Rico. Since the delegation of power is made prospectively to October 15, 1952, pursuant to the second paragraph of § 1 of the "transitory provisions," themselves, it can not be considered as an existing procedure which becomes effective jointly with the Constitution, but as a procedure to be adopted after the Constitution is enforced, it being, therefore, subject to all the restrictions imposed on the different branches of the new Government, by the Constitution itself. The question for decision in the reality of the law is whether the Legislative Assembly, acting under the authority of the former Organic Act of 1917 and not under the temporary power of the "Transitory Provisions," could approve an Act which, upon our Constitution becoming effective, would be inconsistent with the latter. There is not the slightest doubt after examining § 1 of Article IX of the Constitution, that neither the former Legislative Assembly, acting under the authority of the Organic Act of 1917, nor the Legislative Assembly itself, acting under the authority of the "Transitory Provisions" of Article IX, would have had power to approve an Act to take effect after July 25, 1952, which would be in contravention of our Constitution.

It has been alleged that the fact that the Constitution of the Commonwealth of Puerto Rico and the Judiciary Act of the Commonwealth of Puerto Rico became effective at the same time, created a special situation which would not have allowed the action of the normal powers instituted by the Constitution itself. The statement is most inaccurate. In order to prove it we must reduce the litigation to its fair proportion. It was not a question of putting in operation

a unified judicial system, as we have already seen, nor of adopting a new global system of procedures, but to promulgate a simple regulation covering the purely procedural aspects of a petition for review. If we assumed that the former Legislative Assembly had temporary power to implement the Constitution, such rules could have been submitted to the former Legislative Assembly for approval, prior to August 11, 1952. If we assumed that the former Legislative Assembly had no power, they could have been submitted to the First Regular Session of the First Legislative Assembly of the Commonwealth of Puerto Rico, after January 12, 1953. As a matter of fact, such rules were drafted before October 15, 1952 and enforced since October 15, 1952. Although it may be a case of a simple regulation, covering the purely procedural aspects of a writ of review, the result is the alienation, under the guise of a measure of a highly improbable, temporary and transient character, of the right of a Legislative Assembly to sanction the quasi-legislative criterion of a judiciary. And the theory of the transitory character of a measure becomes still more indefensible when we realize that the decision of this matter is indefectibly centered on the constitutional rights of the people.

It is, therefore, more convenient to the high public interests involved in this matter to establish conclusively that our Constitution became effective in all its parts since July 25, 1952 and thereafter our people acquired the full enjoyment of all the rights sanctioned therein, and all the agencies of our Government became subject to the restrictions imposed by the Constitution. To sanction the contrary would be to confuse the transitory power granted to a body to approve laws which might make feasible the holding of elections or the creation of some additional offices in the Government with the inalienable power of a people to organize their life according to their own political will. The Constitution of the Commonwealth of Puerto Rico is the first opportunity

given to a people of feeling free within a system created by themselves. We must defend it with a high spirit of loyalty as our only trump card before posterity. If we are going to show towards our Constitution the same meagerness of spirit as toward our Organic Act, we shall seriously mutilate it for posterity.

The remittance of any rule of procedure adopted by this Court to the Legislative Assembly of the Commonwealth of Puerto Rico is an undeclinable duty of the Supreme Court of Puerto Rico, of which the Legislative Assembly cannot relieve it. The fact that the rules have not been sent to the next regular session of the Legislative Assembly, positively implies that up to this date the rules have not been promulgated pursuant to the method of promulgation provided for by our Constitution, and they lack the force of the law.

We agree with petitioner that the practical effect of declaring a statute unconstitutional, is to leave extant the former legislation: *Ex parte Davis*, 21 Fed. 396 (1884); *Mc Allister* v. *Hamlin*, 23 Pac. 357 (1890); *Carr.* v. *State*, 26 N. E. 778 (1891); *People* v. *Bulter St. Foundry & Iron Co.*, 66 N. E. 349 (1903); *State* v. *Mills*, 133 S. W. 22 (1910); *People* v. *Fox*, 128 N. E. 505 (1920); *Frost* v. *Corporation Commission*, 73 L. Ed. 483, 278 U. S. 515 (1929); 66 A.L.R. 1483 Anno. (1930); *Conlon* v. *Adamski*, 77 F. 2d 397 (1935), especially in a case like the present one, where although it is true that there is a change in the pure substantive aspect of the remedial question, that is, to change a trial *de novo* for an appeal, it is nonetheless true that the delegation of power to regulate the purely procedural aspects of the new writ is unconstitutional, and therefore, it is void without any constitutional effectiveness which makes it binding for the subject of law. In view of the spirit of the second paragraph of § 1 of Article IX of the "Transitory Provisions" of our Constitution, which leaves in force any procedure which has not been expressly repealed by the Constitution,

630

as well as of the language of § 2 of the Judiciary Act, we believe that the practical effect of rendering § 37 of that same law unconstitutional, insofar as it renders effective § 19 as of October 15, 1952, is to leave in force the former relief of trial *de novo*.

It is always rather mortifying to admit restrictions of one's own power. But before the dilemma of subscribing involuntarily to that type of spurious culture which is characteristic of every dictatorship, no matter the sphere where it is produced, we choose mortification rather than complacency. As the highest guardians of the Constitution of the Commonwealth of Puerto Rico, it is our duty to maintain in all its purity this balance between the conservative power which is a symbol of the judiciary and the reform power which is always represented by legislatures, without defrauding the democratic tradition which inspires our own Constitution. I dissent.